1    Brian Segee (Cal. Bar No. 200795)
     Center for Biological Diversity
2    111 W. Topa Topa Street
     Ojai, CA 93023
3    Email: bsegee@biologicaldiversity.org
     Phone: (805) 750-8852
4    *Pro Hac Vice applicant*
5
6    Brendan Cummings (Cal. Bar. No. 193952)
     Anchun Jean Su (Cal. Bar No. 285167)
7    Center for Biological Diversity
     1212 Broadway #800
8    Oakland, CA 94612
     Email: bcummings@biologicaldiversity.org, jsu@biologicaldiversity.org
9    Phone: (510) 844-7100
     *Pro Hac Vice applicants*
10
11   Attorneys for Plaintiffs
12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**TUCSON DIVISION**

13
14
15
16   Center for Biological Diversity, a non-       CASE NO.
     profit organization; and U.S.
17   Representative Raúl Grijalva, an
     individual,
18
19        Plaintiffs,                              **COMPLAINT FOR DECLARATORY**
                                                   **AND INJUNCTIVE RELIEF**
20        v.
21
     John F. Kelly, in his official capacity
22   as Secretary of Homeland Security;
     U.S. Department of Homeland
23   Security; Kevin K. McAleenan, in his
     official capacity as Acting
24   Commissioner, U.S. Customs and
     Border Protection; and U.S. Customs
25   and Border Protection,
26
27        Defendants.
28

## I. INTRODUCTION

1. In this action for declaratory and injunctive relief, Plaintiffs Center for Biological Diversity and Congressman Raúl Grijalva challenge the failure of John Kelly, Secretary of the Department of Homeland Security ("DHS"), DHS, its component agency U.S. Customs and Border Protection ("CBP"), and Acting CBP Commissioner Kevin K. McAleenan (collectively "Defendants" or "DHS") to supplement their environmental analysis of their southern border enforcement program, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.

2. NEPA requires that an environmental impact statement ("EIS") "shall" be supplemented when the "agency makes substantial changes in the proposed action that are relevant to environmental concerns" *or* "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i)-(ii)(emphasis added). Defendants have not updated their programmatic environmental analysis for the southern border enforcement program since late 2001, more than 15 years ago, despite the clear presence of the regulatory factors compelling the preparation of supplemental environmental analysis.

3. On January 25, 2017, President Donald J. Trump issued an Executive Order on "Border Security and Immigration Enforcement Improvements" ("Border Security E.O." [1]), announcing the creation of a "secure, contiguous, and impassable physical barrier" along the entirety of the nearly 2,000 mile long U.S.-Mexico border, in order "to prevent illegal immigration, drug and human trafficking, and acts of terrorism." Since that time, DHS Secretary John Kelly issued a February 17, 2017 memorandum directing specific actions to implement the Border Security E.O. ("Kelly implementing memorandum"), and on March 17, 2017, DHS issued two Requests for

---

[1] Plaintiffs note that the January 25, 2017 E.O. addressed numerous immigration enforcement initiatives not directly related to border security. Plaintiffs' captioning of the E.O. as the "Border Security E.O." is not intended to minimize the importance of those other provisions, but to focus on the border security aspects of the E.O. that are relevant to this case.

Proposals ("RFP")—one for a "Solid Concrete Border Wall Prototype" and the second for "Other Border Wall Prototype."

4.     The Trump administration's rapid mobilization to undertake border wall construction itself would have environmental impacts far larger in scope, extent, and intensity than considered in the previous programmatic environmental analysis. The looming specter of border wall construction, however, is just one example of the substantial changes that have been made to the border enforcement program since the last programmatic analysis in 2001.

5.     In a 1994 programmatic environmental impact statement ("1994 PEIS") and 2001 supplement to that programmatic environmental impact statement ("2001 SPEIS"), the former Immigration and Naturalization Service ("INS") analyzed the environmental impact of its "strategy for enforcement activities within a 50-mile corridor along the U.S./Mexico border," in order to allow INS to "gain and maintain control of the southwest border area" through "the prevention, deterrence, and detection of illegal activities."

6.     The 1994 PEIS and 2001 SPEIS evaluated three primary categories of border enforcement activities with environmental impacts: operations, engineering, and technological. Operational activities encompass a wide variety of CBP activities, including the deployment and stationing of agents, CBP ground patrols, including patrols by sport utility vehicles and other all-terrain vehicles, and CBP air patrols, including patrols by fixed winged aircraft and helicopter. Engineering activities, often undertaken in cooperation with agencies within Department of Defense, include large infrastructure projects such as border fences and walls, road construction and reconstruction, base camps and other facilities, and other buildings, as well as installation of high-intensity stadium lighting, checkpoints, and other portable measures. Technological activities with environmental impacts include the installation of training ground sensors and remote video surveillance systems.

7.     Since approval of the 2001 SPEIS, the southern border enforcement

program has expanded and changed far more rapidly than at any other time in the nation's history. These changes to the southern border enforcement program are "substantial," and are resulting in environmental impacts that were not adequately considered or foreseen in the last supplemental environmental analysis of U.S.-Mexico border enforcement activities in 2001.

8.     In the wake of the September 11, 2001 terrorist attacks, DHS was created and took over the border enforcement responsibilities of the former INS, and Congress provided DHS with significantly increased appropriations and aggressive mandates to secure the southern border. In response, DHS through CBP has deployed thousands of new enforcement agents, increased off-road vehicle patrols, constructed or reconstructed thousands of miles of roads, erected hundreds of miles of border walls and fencing, and installed stadium lighting, radio towers, and remote sensors, among other actions, with environmental impacts far beyond those projected and analyzed in the 1994 PEIS and 2001 SPEIS. This intensification and expansion of border enforcement activities has resulted in impacts to large expanses of federal lands including National Parks, National Forests, National Conservation Areas, and Wilderness Areas, state and local protected areas and parks, international biosphere reserves, rare habitat including wetlands and desert streams and rivers, and numerous threatened and endangered species including desert bighorn sheep and jaguars.

9.     In addition to the substantial changes in the DHS southern border enforcement program since the last supplemental environmental analysis conducted in 2001, several examples of "significant new circumstances or information" have arisen that are relevant to the environmental impacts of the action and that require updated environmental analysis.

10.     These new circumstances or information include, but are not limited to: a) greatly improved scientific understanding of the conservation needs of borderland wildlife species, and the impacts of the DHS southern border enforcement program on those needs; b) new information regarding imperiled species in the borderlands,

including new and improved information regarding the presence and extent of those species, and the designation of final critical habitat within 50 miles of the U.S.-Mexico border under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* for 27 threatened or endangered species; and c) former DHS Secretary Michael Chertoff's use of authority under the REAL ID Act, 8 U.S.C. § 1103 *note*, on five occasions to waive more than 35 laws, including NEPA, that otherwise would have applied to approximately 550 miles of border wall, fencing, and road construction along the southern border.

11.     Despite the passage of 16 years, the border wall construction and other border security intensification measures proposed by the Trump administration, the significant changes in the border enforcement program, and the changed circumstances and other new information, DHS has failed to prepare a new supplement to its programmatic analysis, or to prepare a new programmatic analysis, in violation of NEPA.

## II. JURISDICTION

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346 and 5 U.S.C. §§ 701 to 706. This cause of action arises under the laws of the United States, including NEPA and the Administrative Procedure Act ("APA"), and the implementing regulations established pursuant to these federal statutes. The relief requested is authorized pursuant to 28 U.S.C. §§ 1651 and 2201 to 2202, and 5 U.S.C. §§ 705 and 706. An actual and present controversy exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

## III. VENUE

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e). Plaintiffs Center for Biological Diversity and Raúl Grijalva reside in this judicial district. A substantial part of the events or omission giving rise to the claims has occurred in this district due to decisions made by Defendants, and failure to act by Defendants.

# IV. PARTIES

## A. Plaintiffs

14. Plaintiff Center for Biological Diversity is a non-profit environmental organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has more than 1.1 million members and on-line activists. The Center is headquartered in Tucson, Arizona.

15. The Center's members and staff live in or regularly visit the U.S.-Mexico borderlands region. The Center's Tucson headquarters are located just north of the 50-mile border region, defined as the NEPA "action area" in the 1994 PEIS and 2001 SPEIS, and in which DHS and CBP typically focus their border enforcement program. The Center's members and staff regularly use the myriad federal, state, and local protected lands along the U.S.-Mexico border for hiking, camping, viewing and studying wildlife, photography, and other vocational and recreational activities. The Center's members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from their activities in these areas. Many Center members live within the 50 mile border region "action area" directly impacted by DHS and CBP daily operations. The Center's members and staff have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

16. The Center has a long history of environmental advocacy within the borderlands region generally, and in relation to border security enforcement in particular. The Center commented on and participated in the previous SPEIS process that culminated in 2001, and regularly comments on federal actions impacting the borderlands region, including those occasions when DHS has conducted NEPA for individual border security enforcement projects. In its comments over the course of nearly two decades, the Center has consistently critiqued the absence of an adequate environmental analysis of the border security enforcement program, particularly on imperiled wildlife species that depend upon habitat in both the United States and Mexico.

---

17.     Plaintiff Congressman Raúl Grijalva has been a member of the U.S. House of Representatives since 2002, and is currently the Ranking Member of the House Committee on Natural Resources. Since his election to Congress, Mr. Grijalva has made the environment among his top policy concerns. Mr. Grijalva is the co-chair of the Progressive Caucus and the National Landscape Conservation System Caucus. Mr. Grijalva brings this suit in his professional and personal capacity.

18.     Mr. Grijalva was born, raised and currently lives in Tucson, Arizona. His father emigrated from Mexico in 1945 as a bracero, a laborer brought in by employers with the approval of the U.S. government to help mitigate the loss of skilled laborers, including ranch hands, serving in World War II.

19.     Mr. Grijalva has dedicated himself to public service for more than 40 years. Beginning his public career as a community organizer, he previously served on the Tucson Unified School District Governing Board, where he was the first Latino elected to the board in more than a century, and the Pima County Board of Supervisors, where he served from 1989 to his election to Congress in 2002.

20.     Since his election to Congress, Raúl has been one of the legislature's staunchest environmental champions. Mr. Grijalva's efforts have included opposing waivers from compliance with NEPA and other environmental protections.

21.     Mr. Grijalva has led Congress' efforts to preserve and enhance environmental protections in relation to border security efforts and the DHS U.S.-Mexico border enforcement program. In June 2007, Mr. Grijalva introduced the Borderlands Conservation and Security Act, which would repeal the waiver provision in the REAL ID Act and provide funds for borderlands wildlife management.

22.     As the Ranking Member of the House Natural Resources Committee, which has primary jurisdiction and oversight authority over NEPA, the ESA, wildlife, and federal public lands, Mr. Grijalva is the leading Democrat in the House of Representative on these issues.

23.     In addition to his professional interests in protection of the environment,

wildlife and communities in the U.S.-Mexico borderlands region, Mr. Grijalva has strong personal interests in these areas. Mr. Grijalva regularly visits lands along the U.S.-Mexico border and derives recreational, spiritual, professional, scientific, educational, and aesthetic benefit from his activities in these areas. Mr. Grijalva has specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

24. The above-described aesthetic, recreational, professional, and other interests of the Center and its members, and of Mr. Grijalva, have been, are being, and will continue to be adversely harmed by Defendants' ongoing failure to supplement the programmatic environmental impact statement for its U.S.-Mexico border enforcement program, as required by NEPA.

25. Border security enforcement activities undertaken as part of the DHS southern border enforcement program negatively impact specific areas in the U.S.-Mexico borderlands, threatening wildlife habitat and other environmental resources, harming the Center and its members' interests and Mr. Grijalva's interests. These activities include but are not limited to: road construction, reconstruction and maintenance; border fence construction, reconstruction, and maintenance; installation, operation, and maintenance of high-intensity stadium lighting and other lighting sources; deployment and/or construction of tactical infrastructure, including forward operating bases; use of all-terrain vehicles, motorcycles, off road, and other vehicles to conduct patrols; deployment of thousands of CBP agents; and use of fixed wing aircraft, helicopters, drones, and other aircraft. Such activities by Defendants individually and cumulatively alter the environment in the borderlands, through construction, noise and light impacts, reduction and restriction of wildlife access to habitat, temporary and permanent alteration of the environment, and disturbance and displacement of wildlife.

26. Defendants' actions have harmed and will continue to harm the wildlife populations and individual animals that the Center and its members, and Mr. Grijalva, appreciate and/or study and consequently will reduce their ability to view and/or study

wildlife in the borderlands area. Defendants' actions have degraded the wilderness quality, habitat quality, and aesthetics of the area, and consequently have and will continue to degrade Plaintiffs' and their members' recreational, scientific, and aesthetic experience and enjoyment of the region.

27. Plaintiffs' injuries are directly traceable to Defendants' actions and failures to act. The activities resulting in harm to the environment and consequently to Plaintiffs' interests are either directly carried out by and/or under the control of Defendants, and/or are the foreseeable consequences of Defendants' actions. Defendants have authority to mitigate or require mitigation of the program's environmental impacts, as well as to implement alternative courses of action that would avoid or minimize many of the environmental impacts of the program. Were Defendants directed to complete the required supplemental NEPA analysis, they might require additional environmental mitigation of the program's impacts or adopt alternatives that would minimize or avoid such impacts in the first place. Implementation of additional environmental mitigation and avoidance measures would lessen and thus redress Plaintiffs' and their members' injuries associated with the program.

28. Defendants' failure to comply with NEPA by preparing a supplemental PEIS addressing cumulative environmental impacts also causes Plaintiffs and their members' procedural and informational injuries. The Center, its members, and Mr. Grijalva have and will continue to advocate regarding the program and its environmental impacts, seek to discuss the program with relevant decisionmakers to encourage consideration of alternatives that would avoid, minimize or mitigate environmental harm, and provide information to the public and the media regarding the program and its impacts on the sensitive environmental resources of the borderlands. If Defendants had complied with NEPA by supplementing the PEIS for the southern border enforcement program, the process would have generated additional information on the program's impacts to the species, wildlands and other environmental resources in which they have an interest. Plaintiffs and their members, and Mr. Grijalva in his professional capacity,

would have access to this information and be better informed about the program and its impacts, improving their ability to participate in decisionmaking and to suggest potential mitigation. If Defendants are required to prepare a supplement NEPA analysis of the southern border enforcement program, these informational and procedural injuries would be redressed.

29.     Plaintiffs and their members have no adequate remedy at law and the requested relief is proper.  Relief in this case would ensure supplemental programmatic review of the U.S.-Mexico border security enforcement program that would inform the public and decisionmakers about the environmental impacts of these practices, and would provide a statutorily-mandated opportunity for public participation in the decisionmaking process.  Such a process could result in Defendants adopting alternatives or other measures that would avoid, minimize, or mitigate some or all of Plaintiffs' injuries. Consequently, a declaratory order directing Defendants to prepare such supplemental programmatic environmental analysis in compliance with NEPA would redress the injuries of Plaintiffs and their members.

**B.     Defendants**

30.     Defendant John F. Kelly is the Secretary of the Department of Homeland Security, and is sued in his official capacity.  Mr. Kelly is the official ultimately responsible under federal law for ensuring that the actions and management decisions of DHS comply with all applicable laws and regulations, including NEPA.

31.     Defendant Department of Homeland Security is a United States agency within the executive branch.  DHS is responsible for ensuring border security along the U.S.-Mexico border in accordance with applicable legal requirements including NEPA.

32.     Defendant Kevin K. McAleenan is the Acting Commissioner of U.S. Customs and Border Protection, and is sued in his official capacity.

33.     Defendant U.S. Customs and Border Protection is a federal agency within DHS. CBP became the nation's comprehensive border security agency in March 2013, incorporating U.S. Customs Service, U.S. Border Patrol, and other offices and agencies.

## V. LEGAL BACKGROUND

**A. NEPA**

34. NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It was enacted with the ambitious objectives of "encouraging productive and enjoyable harmony between man and his environment . . . promoting efforts which will prevent or eliminate damage to the environment and biosphere and stimulating the health and welfare of man; and enriching the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.

35. In order to achieve these goals, NEPA contains several "action forcing" procedures, most significantly the mandate to prepare an environmental impact statement on major Federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332 (2)(C).

36. The Supreme Court has found that the preparation of an EIS promotes NEPA's broad environmental objectives in two primary ways: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Methow Valley Citizens Council*, 490 U.S. at 349.

37. The Council on Environmental Quality ("CEQ") was created to administer NEPA and has promulgated NEPA regulations, which are binding on all federal agencies. *See* 42 U.S.C. §§ 4342, 4344; 40 C.F.R. §§ 1500–1508.

38. The scope of NEPA is quite broad, mandating disclosure and consideration of direct, indirect, and cumulative environmental effects. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.27(b)(7).

39. Direct effects are caused by the action and occur at the same time and

place as the proposed project. 40 C.F.R. § 1508.8(a). Indirect effects are caused by the action and are later in time or farther removed in distances, but are still reasonably foreseeable. *Id*. § 1508.8(b). These effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id*. § 1508.8.

40. A cumulative impact is defined as: "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of which agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id*. § 1508.7.

41. NEPA's CEQ implementing regulations recognize that in addition to site-specific projects, the types of 'major Federal action' subject to NEPA's analysis requirements include:

> Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based . . . and adoption of programs, such as a group of concerted actions to implement a specific policy or plan; [and] systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

*Id.* § 1508.18(b)(2)-(3); *see also id*. § 1502.4(b)("Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs . . .Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking").

42. A program EIS "provides an occasion for a more exhaustive consideration of effects and alternatives than would be practicable in a statement on an individual

action.  It ensures consideration of cumulative impacts that might be slighted in a case-by-case analysis.  And it avoids duplicative reconsideration of basic policy questions." *CEQ Memorandum to Federal Agencies on Procedures for Environmental Impact Statements.*  2 ELR 46162 (May 16, 1972).

43.     The Supreme Court has recognized the need for national programmatic environmental analysis under NEPA where a program "is a coherent plan of national scope, and its adoption surely has significant environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 400 (1976).

44.     Programmatic direction can often help "determine the scope of future site-specific proposals." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1089 (9th Cir. 2003). CEQ regulations define this practice as "tiering."  40 C.F.R. § 1502.20 ("Whenever a broad environmental impact statement has been prepared . . . and  a subsequent statement or environmental assessment is then prepared on an action included within the . . . program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action").

45.     NEPA requires that an EIS, including a programmatic EIS, "shall" be supplemented when the "agency makes substantial changes in the proposed action" *or* "significant new circumstances or information" arises that is relevant to the environmental impacts of the action.  40 C.F.R. § 1502.9(c)(1)(i)-(ii) (emphasis added).

46.     CEQ's "40 questions" direct that "[a]s a rule of thumb . . . if the EIS concerns an ongoing program, EISs that are more than 5 years old should be carefully reexamined to determine if the criteria in Section 1502.9 compel preparation of an EIS supplement."  *CEQ Memorandum to Agencies: Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, 46 Fed. Reg. 18,026 (March 23, 1981) (Question 32).

47.     As the Ninth Circuit has stressed in the context of supplemental EISs, "[c]ompliance with NEPA is a primary duty of every federal agency; fulfillment of this

vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558-59 (9th Cir. 2000) (*quoting City of Davis* v. *Coleman*, 521 F.2d 661, 667 (9th Cir. 1975) (holding that fact that plaintiffs did not specifically "identify this new information as the basis for their demands until after they sued the Forest Service did not excuse the Forest Service from earlier assessing the need for an SEIS.")

48.     Agencies are required to apply a "rule of reason" to the decision whether or not to prepare a supplemental EIS. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373-74 (1989). Underlying all of NEPA's procedural requirements is the mandate that agencies take a 'hard look' at all of the environmental impacts and risks of a proposed action. As stated by the Ninth Circuit, "general statements about 'possible effects' and some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (internal citations omitted).

**B.     Endangered Species Act**

49.     The ESA, 16 U.S.C. §§ 1531–1544, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 180 (1978). Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b).

50.     To achieve these objectives, the ESA directs the Secretary of the Interior, through the U.S. Fish and Wildlife Service ("FWS"), to determine which species of plants and animals are "threatened" and "endangered" and place them on the list of protected species. *Id*. § 1533. An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range," or "likely to become endangered in the near future throughout all or a significant portion of its range," respectively. *Id*. § 1532(6), (20).

51.     Once a species is listed, the ESA provides a variety of procedural and substantive protections to ensure not only the species' continued survival, but its ultimate recovery, including the designation of critical habitat, the preparation and implementation of recovery plans, the prohibition against the "taking" of listed species, and the requirement for interagency consultation. *Id.* §§ 1533(a)(3), (f), 1538, 1536.

52.     The ESA recognizes that federal agencies, such as DHS and CBP, have a critical role to play in meeting these statutory purposes. The ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the ESA. *Id.* § 1531(c)(1).

53.     To implement this policy, Section 7(a) of the ESA requires that "Federal agencies shall, in consultation with and with the assistance of [FWS], utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species." *Id.* § 1536(a)(1).

54.     In addition to this programmatic mandate, the ESA requires that "[e]ach Federal agency shall, in consultation with . . . [FWS], insure that *any action* authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat]." *Id.* § 1536(a)(2) (emphasis added).

55.     FWS' regulations define an agency "action" to mean "all activities *or programs* of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02 (emphasis added).

56.     Section 7(a)(2) contains both procedural and substantive mandates. Substantively, it requires that all federal agencies avoid actions that: (1) jeopardize listed species; or (2) destroy or adversely modify designated critical habitat. Procedurally, to ensure compliance with the substantive standards, the federal agency taking action and FWS take part in a cooperative analysis of potential impacts to listed species and their designated critical habitat known as the consultation process. 16 U.S.C. § 1536(a)(2).

The consultation process has been described as the "heart of the ESA." *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011).

57. Through the formal Section 7 consultation process, FWS prepares a "biological opinion" as to whether the action is likely to jeopardize the species or destroy or adversely modify critical habitat and, if so, suggests "reasonable and prudent alternatives" to avoid that result. 16 U.S.C. § 1536(b)(3)(A). During the consultation process, both agencies must "use the best scientific and commercial data available." *Id.* § 1536(a)(2); 50 CFR § 402.14(d).

58. Reinitiation of Section 7 consultation is required if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered, or if a new species is listed or critical habitat is designated that may be affected by the identified action. 50 C.F.R. § 402.16(b) and (d).

**C.  Administrative Procedure Act**

59. The Administrative Procedure Act ("APA") provides for judicial review of "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. Agency action is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). The APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." *Id.* §§ 706(2)(A), (D).

60. In reviewing a challenge to an agency's failure to act, the APA directs that the court "shall compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

# VI. STATEMENT OF FACTS

A. **Increased Border Enforcement and Prior Programmatic Environmental Impact Statements**

    i. **The 1986 Immigration and Control Act and Initiation of the Southern Border Enforcement Program**

61. The Immigration Reform and Control Act of 1986 ("IRCA", Pub. Law 99-603, codified as 8 U.S.C. § 1101 *note* ) was the first Congressional enactment to describe border enforcement as an "essential element" of immigration control. *See* Sec. 111(a) (expressing the sense of Congress that "an increase in the border patrol and other inspection and enforcement activities . . . in order to prevent and deter the illegal entry into the United States" was one of "two essential elements of the program of immigration control established by the Act"). Towards this end, IRCA authorized significantly increased appropriations to U.S. Border Patrol ("USBP") (now part of CBP), allowing for a 50% increase to USBP agent numbers. Sec. 111(b).

62. IRCA failed to slow levels of undocumented immigration, and in 1994 USBP issued its "prevention through deterrence" strategy and programmatic southern border enforcement plan. *See Border Patrol Strategic Plan: 1994 and Beyond*. This coherent national plan, which persists today, represented the first time in its 70 year history that USBP developed a border control strategy.

63. As part of the development and implementation of the southern border enforcement program, INS and USBP increased collaboration with the military. Most notably, Joint Task Force Six ("JTF-6"), an agency of the Department of Defense ("DOD"), was activated in November 1989. Now called Joint Task Force North ("JTF-N"), its stated mission is "to plan and coordinate military training along the U.S. Southwest Land Border in support of counter-drug activities." 59 Fed. Reg. 26,322 (May 19, 1994). To this end, JTF-N provides "operational, engineering, and general support" to law enforcement agencies including USBP. JTF-N has provided extensive operational, engineering, construction, and other mission support to DHS border security

efforts.

ii.    **1994 Programmatic Environmental Impact Statement for INS and Joint Task Force Six Prevention through Deterrence Program**

64.    Recognizing that the intensification and expansion of border enforcement efforts under the USBP southern border enforcement program would be implemented through numerous individual federal actions with myriad synergistic and cumulative environmental impacts throughout the U.S.-Mexico border region, the Department of Justice (under which INS and USBP were housed) issued a notice of intent to prepare a programmatic environmental impact statement on July 15, 1993 (58 Fed. Reg. 38,140).

65.    A draft programmatic environmental impact statement addressing border enforcement efforts was subsequently released on May 19, 1994. *Notice of Availability of the Draft Programmatic Environmental Impact Statement (DPEIS): Draft Programmatic Environmental Impact Statement to Continue the Program of Protecting the Southwest Border Through the Interdiction of Illegal Drugs With the Support of the Joint Task Force Six.* 59 Fed. Reg. 26,322 (May 19, 1994).

66.    Department of Justice served as the lead agency for the 1994 PEIS. DOD, parent agency of JTF-6, served as a cooperating agency, since at that time "the Border Patrol [was] the primary beneficiary of most JTF-6 engineering," including roads and radio towers.

67.    The stated purpose of the PEIS was "to address cumulative environmental impacts of previous actions as well as those actions which may be developed within the reasonably foreseeable future." 59 Fed. Reg. 26,322.

68.    DOJ specifically based the life span of the PEIS on the "reasonably foreseeable future" five-year time frame it chose for the analysis, from 1994 to 1999.

69.    The 1994 PEIS estimated that from the beginning of the southern border enforcement program through the end of its five year analysis period in 1999, a total approximately 3,700 acres of wildlife habitat would be negatively impacted by the government's southern border enforcement activities.

70. On October 5, 1994, DOJ issued its release of the final PEIS. *Notice of Availability of the Final Programmatic Environmental Impact Statement (DPEIS): Final Programmatic Environmental Impact Statement to Continue the Program of Protecting the Southwest Border Through the Interdiction of Illegal Drugs With the Support of the Joint Task Force Six.* 59 Fed. Reg. 50,773. On March 9, 1995, INS issued the Record of Decision.

### iii. 2001 Supplemental Programmatic Environmental Impact Statement

71. In April 1999, DOJ released a draft supplemental EIS to the 1994 PEIS. 64 Fed. Reg. 15,969 (April 2, 1999) (weekly EPA notice of EIS availability). *Programmatic EIS—INS and JTF-6. Revised to Address Potential Impacts of Ongoing Activities from Brownsville, Texas to San Diego, California* ("SPEIS"). DOJ subsequently issued a revised draft of the SPEIS in September 2000. 65 Fed. Reg. 58,527 (Sept. 29, 2000) (weekly EPA notice of EIS availability); 65 Fed. Reg. 63,076 (Oct. 20, 2000) (corrected weekly EPA notice of EIS availability).

72. Like the 1994 PEIS, DOJ served as the lead agency and DOD served as the cooperating agency for the 2001 SPEIS. The document was prepared, however, by the Fort Worth District of U.S. Army Corps of Engineers. Army Corps, an agency of DOD, is extensively involved in supporting the DHS border security mission, has constructed infrastructure for DHS including border fencing, checkpoints, CBP stations, and other infrastructure, and has served as DHS's primary contractor for several major border infrastructure projects.

73. This supplement was legally required due to the fact that the 1994 PEIS by its own terms only addressed potential actions through 1999. *See* SPEIS at p. 1-1 ("In order to continue to comply with NEPA, INS and JTF-6 prepared this SPEIS addressing the cumulative effects of past (since 1989) and reasonably foreseeable projects undertaken by JTF-6 in support of INS/USBP.").

74. In addition, the supplemental analysis was necessary due to the 1996

passage of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA", P..L. 104–208, 110 Stat. 3009). The IIRIRA intensified the southern border enforcement program and significantly increased USBP operations, programs, and staff.

75. The significant increase in agent numbers and extensive physical infrastructure developments needed to support that staff and the increasingly aggressive border enforcement efforts was predicted to result in environmental impacts which had not been analyzed in the 1994 PEIS.

76. Like the 1994 PEIS, the 2001 SPEIS addressed anticipated and potential projects over a five year time frame (*i.e.* from 2001-2005). The SPEIS noted that even though funding was not assured and the difficulty in identifying the specific location, design, and/or schedule for individual projects, the supplemental PEIS was necessary under NEPA. The SPEIS was intended to serve a valuable role by describing the general types of projects and expected environmental impacts, and by using data from past projects to assess the potential impact of future projects and their cumulative effects.

77. The SPEIS (Table 2-1) provided quantified estimates of predicted additive infrastructure development with environmental impacts for the 2001-2005 time period, as follows:

<u>By number of miles</u>: Road construction or reconstruction (1,951); Drag roads (165); Primary fence (180); Secondary fence (37); Vehicle barriers (111);

<u>By number of items</u>: Lights (stadium-style) (4,677); Scopes (61); Cameras/RVS (385); Repeater site (11); Boat ramps (7).

78. The 2001 SPEIS identified two "primary areas of controversy," the first being loss of wildlife habitat. During the 2001-2005 time frame of border enforcement activities considered under the SPEIS, the Army Corps estimated that the anticipated infrastructure development would result in impacts to an additional 6,900 acres of wildlife habitat.

79. The anticipated level of anticipated wildlife habitat impacts during the 2001-2005 five year period was thus anticipated to be nearly double the 3,700 acres of

habitat impacted during the first eleven years (1989-2000) of the southern border enforcement program.

80.    The SPEIS provided generalized estimates of potential losses to three broad categories of wildlife populations from these anticipated habitat alterations within Chihuahuan desert scrublands and Sonoran desert scrublands ecosystems. Together, the SPEIS estimated individual mortality of lizards (maximum ~ 215,000), birds (maximum ~ 6,000), and small mammals (maximum ~36,000).

81.    Added to the previous 3,700 acres of wildlife habitat anticipated to be impacted during the first eleven years (1989-2000) of the southern border enforcement program, the SPEIS projected a cumulative total of 10,600 acres of wildlife habitat would be negatively impacted during the first 15 years of intensified border enforcement efforts (1989-2005).

82.    Most of the anticipated environmental impacts in the 2000-2005 time frame considered by the SPEIS were expected to occur in Texas. For example, Table 2-1 depicts the large majority of proposed road construction (1,267 miles of 1,951 miles total), lighting, cameras/RVs, and boat ramps as being located in Texas, as well as half of proposed primary fencing (90 miles of 180 miles); SPEIS, at p. 2-2 ("The majority of these activities are planned in Texas, as would be expected since it is the largest state within the study area.").

83.    A large majority of the anticipated 6,900 acres of impacts during the 2000-2005 time frame considered by the SPEIS were expected to result from road construction, primarily in Texas (4,121 acres) and Arizona (1,015 acres). SPEIS, at p. 4-26.

84.    Future border fencing projects were expected to impact only 225 acres, primarily in Texas (109 acres) and California (109 acres). SPEIS, at p. 4-26.

85.    In addition to wildlife impacts, the SPEIS also programmatically addressed impacts to soils, water resources, air quality, noise, socioeconomic resources, and cultural resources, and included a separate general cumulative impacts analysis.

86. In addressing soil impacts, the SPEIS estimated full implementation of projected USBP operations would result in 6,900 acres of soil disturbance. SPEIS, at p. 4-1. This estimate was based on an assumed average road width of 25 feet. The SPEIS noted that compliance with Clean Water Act requirements, 33 U.S.C. § 1251 *et seq.*, through preparation of Stormwater Pollution Prevention Plans ("SWPPP") and adherence to National Pollutant Discharge Elimination System ("NPDES") general permits, would require the agency to incorporate erosion control designs into infrastructure construction plans.

87. Similarly, in addressing water resource impacts, the SPEIS relied on future compliance with Clean Water Act requirements to reduce the potential of adverse impacts. SPEIS, at p. 4-4 ("Employment of a SWPPP and other erosion control measures . . . would significantly reduce the potential of adverse impacts to water resources through erosion and sedimentation.").

88. In addressing wildlife resource impacts, the SPEIS relied upon site-specific NEPA analysis and ESA Section 7 consultations with FWS to avoid or mitigate effects. SPEIS, at p. 4-14-4-15 ("All NEPA documents . . . are submitted to the USFWS and appropriate state agency(s) for review . . . The assessments not only address potential effects to protected species, but also identify changes in daily operations that would be implemented to avoid or mitigate these effects.").

89. The final SPEIS was issued in July 2001. 66 Fed. Reg. 35,618 (weekly EPA notice of EIS availability).

**B.    Subsequent NEPA Documents "Tiering" to the 1994 PEIS and 2001 SPEIS**

90. DOJ/INS and, after its creation, DHS/CBP have prepared subsequent NEPA environmental analyses that tier to the previous 1994 PEIS and 2001 SPEIS. For example, USBP in 2002 released a draft programmatic EIS for operations specific to the Tucson and Yuma Sectors in Arizona that tiered to the 2001 supplemental PEIS. *Programmatic EIS—Office of Border Patrol Operational Activities within the Border Areas of the Tucson and Yuma Sectors, Expansion of Technology-Based Systems,*

*Completion and Maintenance of Approved Infrastructure, Cochise, Pima, Santa Cruz and Yuma Counties, AZ.* ("Arizona draft PEIS")

91.     In the Arizona draft PEIS, USBP estimated that the proposed infrastructure projects (stadium lighting, helipad construction, remote processing facility construction, road construction and improvement, primary fencing, secondary fencing, vehicle barriers, vegetation clearing) would directly impact more than 5,200 acres of wildlife habitat.  When proposed operational impacts are also added, the Arizona draft PEIS estimated anticipated impacts to wildlife habitat totaling nearly 7,000 acres.

92.     The Arizona draft PEIS estimates of impacted wildlife habitat far exceed the 2001 SPEIS estimates, prepared only a year earlier, of impacted acreage from the border enforcement program along the *entire* U.S.-Mexico border during 2000-2005.

93.     According to the Center's information and belief, USBP never released a final programmatic EIS or record of decision for the Arizona PEIS.

94.     In 2007, DHS released an NOI to prepare an EIS for the construction and operation of tactical infrastructure in the USBP Rio Grande Valley Sector in Texas that would tier to the 1994 PEIS and 2001 supplemental PEIS.  72 Fed. Reg. 54,276 (Sept. 24, 2007) ("[T]he EIS will analyze the site-specific environmental impacts of the Proposed Action, which were broadly described in [the] two previous programmatic EISs prepared by the former [INS] and [JTF-6], [and] were prepared to address the cumulative effects and past and reasonably foreseeable projects.").   The proposed actions included construction of pedestrian fences, supporting patrol roads, lights, and other infrastructure along approximately 70 miles of the border.

95.     In 2007, DHS also released an NOI to prepare an EIS for the construction and operation of tactical infrastructure in the USBP San Diego Sector that would tier to the 1994 PEIS and 2001 supplemental PEIS.  72 Fed. Reg. 54,277 (Sept. 24, 2007). The proposed actions included construction of pedestrian fences, vehicle barriers, supporting patrol roads, lights, and other infrastructure along approximately 4 miles of the border.

96. In 2008, DHS released a draft EA for the construction, operation, and maintenance of border infrastructure within USBP El Paso Sector that tiered to, among other NEPA analysis, the 2001 SPEIS. The proposed actions included 56.7 miles of primary fencing, 21 miles of permanent lighting, construction of 8 bridges across irrigation canal, and improvement of 2 miles of existing dirt road. The EA specifically tiered to the prior cumulative effects analysis in the 2001 SPEIS to conclude that "minor [unspecified] cumulative effects would occur due to construction of all USBP projects."

97. In September 2011, DHS released a final EA and Finding of No Significant Impact for a proposed forward operating base on a 1-acre site at the western edge of Organ Pipe Cactus National Monument that tiered to, among other NEPA analysis, the 2001 SPEIS.

## C. 2013 Northern Border Programmatic Environmental Impact Statement

98. Although DHS has not supplemented its programmatic EIS for the U.S.-Mexico border security enforcement program since the 2001 SPEIS, the agency has recently completed a new programmatic PEIS for the Northern U.S.-Canada border.

99. The notice of intent for the northern border PEIS was published on November 9, 2010, 75 Fed. Reg. 68,810, after DHS had previously proposed preparing four separate regional PEISs. DHS decided to prepare the single PEIS based on two considerations also applicable to the ongoing southern border enforcement program: i) the "need to identify a single unified proposal and alternatives for maintaining or enhancing security along the Northern border"; and ii) the fact that "certain resources of concern," including "habitat of various wildlife . . . extend or move across the PEIS regions . . . [and] thus, to ensure that CBP effectively analyzes and conveys impacts that occur across regions of the Northern Border, a unified PEIS is desirable."

100. DHS issued the Final PEIS for Northern Border Activities in July 2012, and ROD for the Northern Border PEIS on April 11, 2013, approving the "Detection, Inspection, Surveillance, and Communications Technology Expansion Alternative," as

the "most representative of the approach" DHS intends to employ "over the next five to seven years." The ROD pledges that if "within five years of signing this ROD, CBP is required to adopt additional measures beyond the scope of the alternative selected at this time," it would "evaluate whether environmental conditions have changed or additional alternatives need to be evaluated such that a supplemental Northern Border PEIS is required."

## D.     The Proposed Action (Southern Border Enforcement Program) Has Substantially Changed Since the 2001 SPEIS

101.    NEPA regulations direct that an EIS shall be supplemented when the "agency makes substantial changes in the proposed action."     40 C.F.R. § 1502.9(c)(1)(i).    As detailed below, DHS has made substantial changes in the U.S.-Mexico border enforcement program, which in turn have resulted in environmental impacts that were not considered or were inadequately considered in the 1994 PEIS and 2001 SPEIS.    Moreover, the SPEIS by its own terms only addressed anticipated environmental impacts over a five-year (2001-2005) time period.    Accordingly, further supplementation of the 2001 SPEIS is required under NEPA.

102.    In response to the September 11, 2001 terrorist attacks, Congress in 2002 created DHS, abolished the INS, and transferred its border security enforcement functions and USBP to DHS.    USBP, Customs Service, and other agencies and offices were, in turn, consolidated into CBP.

103.    Also in response to 9/11, in 2005 JTF-6 was renamed JTF-North and added counter-terrorism efforts to its mission.    JTF-North, which remains part of DOD, continues to provide extensive operational, engineering, and construction support to DHS and CBP border enforcement efforts.

104.    In a comprehensive 2016 overview of border security efforts, the Congressional Research Service noted that under "a variety of indicators, the United States has substantially expanded border enforcement resources over the last three

decades. *Particularly since 2001*, such increases include border security appropriations, personnel, fencing and infrastructure, and surveillance technology." Congressional Research Service, "Border Security: Immigration Enforcement Between Ports of Entry" ("CRS Report")(April 19, 2016) (emphasis added).

105. These increases represent substantial changes to the southern border enforcement program initiated in 1989 and programmatically analyzed under the 1994 PEIS and 2001 SPEIS, and are resulting in direct, indirect, and cumulative environmental impacts along the U.S.-Mexico border that were unaddressed or inadequately addressed in those prior programmatic NEPA documents. Consequently, DHS is required to prepare a further supplemental PEIS.

106. Annual border enforcement appropriations grew from $263 million in the years following the inception of the southern border enforcement program in FY 1990 to $1.4 billion FY 2002. Since 9/11 and the creation of DHS, annual appropriations increased again by an additional 170 percent, to $3.8 billion in FY 2015.

107. CBP is better staffed today than at any time in its history, at levels far higher than those envisioned or analyzed in the 2001 SPEIS.

108. There were approximately 9,200 USBP agents in 2001. The 2001 SPEIS projected that "up to 1,000 new USBP agents should be hired over the next 10 years" (longer than the general 5 year time frame of the SPEIS) for a total of approximately 10,200 agents. SPEIS, at p. 4-18.

109. In the five year time period 2004-2009, CBP in fact doubled the number of agents from approximately 10,000 to more than 20,000 agents.

110. The doubling of CBP agents, and the resultant environmental impacts of this rapid and unanticipated expansion, represent a substantial change to the southern border enforcement program, requiring DHS to supplement the 2001 SPEIS.

111. The extent and location of fencing and infrastructure construction also represent substantial changes in the southern border enforcement program from that considered in the 2001 SPEIS, and is resulting in direct, indirect, and cumulative

environmental impacts along the U.S.-Mexico border that were unaddressed or inadequately addressed in the 1994 PEIS and 2001 SPEIS

112. The 2001 SPEIS projected that 180 miles (81 in California, 9 in Arizona) of primary fence, 37 miles (28 in Arizona, 9 in California) of secondary fence, and 111 miles (90 in Texas, 12 in California, 9 in Arizona) would be constructed from 2000-2005.

113. Since 2001, border wall and barrier construction has been driven by newly enacted legislation, including the REAL ID Act of 2005 (Pub. Law 109-13, div. B)(enacted as a legislative rider to the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005), the Secure Fence Act of 2006 (Pub. Law 109-367), and the Consolidated Appropriations Act, 2008 (Pub. Law 110-161, div. E). Collectively, these laws direct DHS to construct "not less than 700 miles" of border fencing (not necessarily walls). 8 U.S.C. § 1103 *note*.

114. As of May 2015, DHS had installed a total of 653 miles of border fencing (353 miles of primary pedestrian fencing, 300 miles of vehicle fencing, 36 miles of secondary fencing behind the primary fencing, and 14 miles of tertiary fencing behind the secondary fence). CRS Report, at p. 15. The extent of this border fencing and road infrastructure greatly exceeds the levels of such infrastructure as forecast in the 2001 SPEIS, and represents a substantial change to the southern border enforcement program requiring further supplemental analysis to the PEIS.

**E.    Significant New Information and Circumstances Have Arisen Concerning the Environmental Impact of the Southern Border Enforcement Program**

115. NEPA requires that an EIS "shall" be supplemented when "significant new circumstances or information" arises that is relevant to the environmental impacts of the action. 40 C.F.R. § 1502.9(c)(1)(ii). As detailed below, significant new circumstances or information are present in this case, which in turn have resulted in or revealed environmental impacts that were not considered or were inadequately considered in the 1994 PEIS and 2001 SPEIS. Accordingly, further supplementation of the PEIS is

required under NEPA.

### i. Wildlife Impacts

116. The U.S.-Mexico borderlands harbor some of North America's rarest wildlife and plants, and at least 700 neotropical birds, mammals, and insects migrate through the borderlands each year. Endangered, threatened, rare, and/or endemic borderland mammals include the jaguar, ocelot, Mexican gray wolf, Sonoran pronghorn, black-tailed prairie dog, jaguarundi, and bighorn sheep.

117. Impacts of the DHS southern border enforcement program on wildlife species have been a central environmental issue throughout the programmatic NEPA process. In particular, the cumulative effect of border enforcement actions on the loss of borderland wildlife habitat, including habitat for threatened and endangered species, was identified as a major environmental effect and one of two "primary areas of controversy" in the 2001 SPEIS.

118. Scientific study of the impacts of the southern border enforcement program was largely absent at the time of the 1994 PEIS and 2001 SPEIS. Since that time, scientific understanding of these impacts has dramatically progressed, particularly in relation to imperiled transboundary wildlife (*i.e.* those dependent on habitat in both the U.S. and Mexico for survival including breeding, feeding, and rearing areas).

119. Since the 2001 SPEIS, significant new information has arisen concerning the conservation needs of many of these wildlife species, and the past, present, and reasonably foreseeable future impacts and cumulative impacts that the DHS southern border enforcement program will have on individual animals and their larger populations. This information shows that continued implementation of the program, particularly without efforts to conduct prior study of or to mitigate such impacts, may result in the localized extinction of borderlands wildlife including black bears, as well as species listed under the ESA such as jaguar and bighorn sheep.

120. For example, a published scientific study, Flesch *et al.* (2009) *Potential effects of the United States-Mexico border fence on wildlife*, noted that "[t]ransboundary

development, including fences, roadways, lighting, vegetation clearing, and increased human activity, threatens to alter [landscape] connectivity in large scales in over 20 nations." The authors further noted the specific importance of the U.S.-Mexico borderlands region, stating that "[t]ransboundary connectivity is especially relevant to conservation in this region because several major biogeographic provinces converge and produce the range limits of many Neotropical and Nearctic taxa . . . [and] broad elevation and moisture gradients produce fragmented distributions of many populations."

121. Flesch *et al*. (2009) concluded that "persistence and recovery of other species present in low numbers such as jaguar and Sonoran pronghorn may depend on transboundary movements," and that "[p]ersistence of black bears in northern Sonora and Texas may depend, respectively, on movements from Arizona and Coahuila."

122. In addition, Lasky *et al*. (2011) *Conservation biogeography of the U.S.-Mexico border: a transcontinental risk assessment of barriers to animal dispersal* evaluated the impacts of intensive human land use and border barriers on species vulnerable to global and local extinction. According to the authors, their assessment is "the first transcontinental study . . . to quantitatively evaluate potential impacts of dispersal barriers on the highly biodiverse ecological communities along the US-Mexico border and the first to provide planning recommendations based on such an analysis."

123. Lasky *et al*. (2011) specifically noted that in addition to physical border barriers (fences and walls), the "activity of humans in unfenced areas may also restrict animal dispersal, such that border permeability may be significantly reduced in areas we did not identify as barriers."

124. The 1994 PEIS and 2001 SPEIS did not consider the impacts of the U.S.-Mexico border on wildlife transboundary movements.

125. The 1994 PEIS and 2001 SPEIS also did not provide specific analysis of many key borderland wildlife species, including threatened and endangered species. The 1994 PEIS and 2001 SPEIS, for example, provide no mention of jaguars or black

bears.

126.   The new scientific information available regarding the impact of the DHS southern border enforcement program on borderlands wildlife, and the potential of the program to result in localized extinction of this wildlife, is significant new information requiring further supplementation of the 1994 PEIS and 2001 SPEIS.

### ii.    Threatened and Endangered Species Impacts

127.   In addition to the new information and circumstances relevant to wildlife species generally, significant new information and circumstances have also arisen regarding impacts of the DHS southern border enforcement program on threatened and endangered species in particular.

128.   The endangered jaguar is a prime example of how significant new information and circumstances have arisen with respect to threatened and endangered species since the 2001 SPEIS.

129.   The 2001 SPEIS does not mention jaguars.

130.   After the last known known jaguars in Arizona was shot and killed in the 1960s and 1970s, no jaguars were seen in the state for approximately 15 years. Confirmed jaguar sightings began to occur in 1990s in the U.S. borderlands region, and since the 2001 SPEIS, several individual adult jaguars have been documented in the U.S. borderlands region, including the jaguar named *Macho B* and the jaguar named *El Jefe* (named by Tucson area schoolchildren), both of which were documented over the course of several years. Additional jaguars were documented in the Huachuca Mountains and Dos Cabezas Mountains in November and December 2016, respectively, and the jaguar photographed in the Huachuca Mountains has also been photographed in 2017.

131.   ESA critical habitat (as required by Center litigation) for the jaguar was finalized in March 2014. 79 Fed. Reg. 12,572 (March 5, 2014).

132.   The final critical habitat rule requires that all of the jaguar's seven identified primary constituent elements be present in order for each specific area to constitute critical habitat, "including connectivity to Mexico." 79 Fed. Reg. 12,572, at

12,587.

133. The new information and circumstances regarding jaguar sightings, new critical habitat designations, and the need for jaguar habitat connectivity with Mexico is significant and relevant to the environmental effects considered in the 1994 PEIS and 2001 SPEIS.

134. Including the jaguar, since approval of the 2001 SPEIS, FWS has finalized new or revised ESA critical habitat designations for 27 species consisting of areas along, or within 50 miles of, the U.S.-Mexico border:

   i. Otay tarplant (threatened): 67 Fed. Reg. 76,030 (Dec. 10, 2002);

   ii. Cushenbury oxytheca (endangered): 67 Fed. Reg. 78,570 (Dec. 24, 2002);

   iii. Mexican spotted owl (threatened): 69 Fed. Reg. 53,182 (Aug. 31, 2004);

   iv. Gila Chub (endangered): 70 Fed. Reg. 66,664 (Nov. 2, 2005);

   v. Laguna Mountains skipper (endangered): 71 Fed. Reg. 74,592 (Dec. 12, 2006);

   vi. Mexican flannelbush (endangered): 72 Fed. Reg. 54,984 (Sept. 27, 2007);

   vii. San Diego fairy shrimp (endangered): 72 Fed. Reg. 70,648 (Dec. 12, 2007);

   viii. Coastal California gnatcatcher (threatened): 72 Fed. Reg. 72,010 (Dec. 19, 2007);

   ix. Peirson's milk-vetch (threatened): 73 Fed. Reg. 8,748 (Feb. 14, 2008);

   x. Devils River minnow (threatened): 73 Fed. Reg. 46,988 (Aug. 12, 2008);

   xi. San Bernardino bluegrass (endangered): 73 Fed. Reg. 47,706 (Aug. 14, 2008);

   xii. San Diego thornmint (threatened): 73 Fed. Reg. 50,454 (Aug. 26, 2008);

   xiii. Bighorn sheep (peninsular ranges DPS) (endangered): 74 Fed. Reg. 17,288 (April 14, 2009);

   xiv. Piping plover (Texas wintering population) (threatened): 74 Fed. Reg. 23,476 (May 19, 2009);

xv.     Quino checkerspot butterfly (endangered): 74 Fed. Reg. 28,776 (June 17, 2009);

xvi.     Spreading navarretia (threatened): 75 Fed. Reg. 62,192 (Oct. 7, 2010);

xvii.     San Diego ambrosia (endangered): 75 Fed. Reg. 74,546 (Nov. 30, 2010);

xviii.     Thread-leaved brodiaea (threatened): 76 Fed. Reg. 6,848 (Feb. 8, 2011)

xix.     Arroyo toad (endangered): 76 Fed. Reg. 7,246 (Feb. 9, 2011);

xx.     Willowy monardella (endangered): 77 Fed. Reg. 13,394 (March 6, 2012);

xxi.     Chiricahua leopard frog (threatened): 77 Fed. Reg. 16,324 (March 20, 2012);

xxii.     Western snowy plover (Pacific DPS) (threatened): 77 Fed. Reg. 36,728 (June 19, 2012);

xxiii.     Riverside fairy shrimp (endangered): 77 Fed. Reg. 72,070 (Dec. 4, 2012);

xxiv.     Southwestern willow flycatcher (endangered): 78 Fed. Reg. 344 (Jan. 3, 2013);

xxv.     Tidewater goby (endangered): 78 Fed. Reg. 8,746 (Feb. 6, 2013);

xxvi.     Jaguar (endangered): 79 Fed. Reg. 12,572 (March 5, 2014);

xxvii.     Acuña cactus (endangered): 81 Fed. Reg. 55,266 (August 18, 2016).

135.     Nearly all of these 27 species with newly designated or revised critical habitat rely on habitat in both the United States and Mexico, and the critical habitat rules specifically note that DHS operations undertaken as part of  the southern border enforcement program have been documented to negatively impair many of the species. *See, e.g.* Peirson's milkvetch (construction and maintenance of facilities by USBP, and other monitoring and enforcement activities of USBP involving vehicular operations on the Algodones Dunes, having negative impacts); jaguar (special management considerations needed "to alleviate the effects of border-related activities, allowing for some level of permeability so that jaguars may pass through the U.S.-Mexico border"); acuña cactus (recommending that USBP "minimize construction of new border control facilities, roads, towers, or fences"; special management considerations needed to

address off-road border-related human disturbances); arroyo toad (borderlands subunit "may require special management considerations or protection to address threats from [USBP] activities").

136.   The Ninth Circuit has held that new protective designations for wildlife species, including ESA critical habitat, require the action agency "to evaluate in a timely manner the need to supplement the original EIS in light of that new information." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 559 (9th Cir. 2000).  The need to conduct this evaluation is particularly important where the agency has not considered the species' biological status in previous environmental analysis.

137.   As detailed above, significant new information and circumstances relevant to the impacts of the DHS border enforcement program on threatened and endangered species and their habitat has arisen since the 2001 SPEIS, thus compelling preparation of supplemental environmental analysis.

### iii.   REAL ID Legal Waivers Impacts

138.   The 2005 REAL ID Act gives the DHS Secretary "authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." 8 U.S.C. § 1103 *note*, Section 102(c).

139.   During the George W. Bush administration, DHS Secretary Michael Chertoff published five "notices of determination" in the *Federal Register* that he was invoking the REAL ID waiver authority, exempting a total of more than 35 laws that would have otherwise applied to construction of border fencing and roads: i) San Diego (70 Fed. Reg. 55,622)(Sept. 22, 2005); ii) Barry M. Goldwater Range, Arizona (72 Fed. Reg. 2,535)(Jan. 19, 2007); iii) San Pedro Riparian National Conservation Area (administered by U.S. Bureau of Land Management), Arizona (72 Fed. Reg. 60,870)(Oct. 26, 2007);   iv) Hidalgo County, Texas (73 Fed. Reg. 19,077)(April 3, 2008)(corrected on April 8, 2008); v) >450 miles in Texas, New Mexico, Arizona, and

California (73 Fed. Reg. 18,293)(April 3, 2008). Collectively, the five Chertoff REAL ID determinations waived laws that otherwise would have applied to approximately 550 miles of border wall and road construction. In all five of these determinations, the Secretary waived application of NEPA. Consequently, DHS has not conducted site-specific NEPA on a significant aspect of its U.S.-Mexico border enforcement program.

140. In addition to NEPA, in all five of these determinations, DHS Secretary Chertoff waived application of the ESA, Clean Water Act (33 U.S.C. § 1251 *et seq*.), National Historic Preservation Act (Pub. Law 89-665), Migratory Bird Treaty Act (16 U.S.C. § 703 *et seq*.), Clean Air Act (42 U.S.C. § 7401 *et seq*.), Archeological Resources Protection Act (16 U.S.C. 470aa *et seq*.), Safe Drinking Water Act (42 U.S.C. § 300f *et seq*.), Wild and Scenic Rivers Act (16 U.S.C. § 1281 *et seq*.), Wilderness Act (16 U.S.C. § 1131 *et seq*.), National Forest Management Act (16 U.S.C. § 1600 *et seq*.), Native American Graves Protection and Repatriation Act (42 U.S.C. § 2000bb), and American Religious Freedom Act (42 U.S.C. § 1996), as well as numerous additional laws.

141. The REAL ID Act waiver, and its repeated utilization by DHS Secretary Chertoff, represents new information or circumstances requiring supplementation of the 1994 PEIS and 2001 SPEIS. Due to the use of the waiver, DHS has failed to perform site-specific NEPA analysis or abide by numerous other environmental, cultural, and religious freedom laws on approximately 550 miles of border fencing and associated road construction.

142. As described above, the 2001 SPEIS repeatedly and expressly relied on compliance with the CWA, ESA and other environmental laws to predict that environmental effects would be avoided or mitigated.

143. The construction of barriers and roads carried out pursuant to the REAL ID waivers is a subset of the overall southern border enforcement program. Consequently, even if such construction was itself exempt from NEPA, its occurrence and current existence on the landscape was never analyzed in the environmental baseline or cumulative effects sections of the 1994 PEIS or 2001 SPEIS. These road, barriers and

related activities, and their environmental impacts represent significant new information mandating further supplementation of the 1994 PEIS and 2001 SPEIS.

**F. The January 25, 2017 Executive Order and DHS Implementing Actions Are Resulting In Further Substantial Changes to the Southern Border Enforcement Program**

144. Within days of taking office, President Donald J. Trump issued the Border Security E.O., directing DHS to "secure the southern border of the United States through the immediate construction of a physical wall on the southern border."

145. The Border Security E.O. defines "wall" to mean "a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier." (Sec. 3(e)). The Border Security E.O. further directs the Secretary to "take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border . . . [in order] to most effectively achieve complete operational control" (Sec. 4(a)) of the U.S.-Mexico border," and produce "a comprehensive study of the security of the southern border" (Sec. 4(d)) within 180 days.

146. The Border Security E.O. also addresses other aspects of the border enforcement program that would have significant environmental effects.

147. For example, Section 5 of the Border Security E.O. directs the DHS Secretary to "take all appropriate action and allocate all legally available resources to immediately construct, operate, control, or establish contracts to construct, operate, or control facilities to detain aliens at or near the border with Mexico."

148. Section 8 of the Border Security E.O. directs the DHS Secretary, through the CBP Commissioner, "to hire 5,000 additional [CBP] agents," and to take "all appropriate action to ensure such agents enter on duty and are assigned to duty stations as soon as is practicable."

149. Section 12 of the Border Security E.O. would authorize DHS to enter federal lands, including National Parks, National Forests, Wilderness Areas, and other protected federal lands, without constraint.

150.    DHS Secretary John Kelly issued an implementing memorandum for the Border Security E.O. on February 17, 2017 ("Kelly implementing memorandum").

151.    The Kelly implementing memorandum directs the CBP Commissioner to "immediately begin the process of hiring 5,000 additional Border Patrol agents, as well as 500 Air & Marine Agents/Officers, and take all actions necessary to ensure that such agents/officers enter on duty and are assigned to appropriate duty stations . . .as soon as practicable."

152.    In addition, the Kelly implementing memorandum directs CBP to "immediately begin planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, along the land border with Mexico in accordance with existing law, in the most appropriate locations and utilizing appropriate materials and technology to most effectively achieve operational control of the border."

153.    Finally, the Kelly implementing memorandum directs the DHS Under Secretary for Management, in consultation with the CBP Commissioner, to "immediately identify and allocate all sources of available funding for the planning, design, construction, and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrols and access roads, and develop requirements for total ownership cost this project, including preparing Congressional budget request for the current fiscal year (e.g., supplemental budget requests) and subsequent fiscal years."

154.    In addition to the Kelly implementing memorandum, DHS is implementing the Border Security E.O. through the March 17, 2017 release of two Requests for Proposals ("RFP")—one for a "Solid Concrete Border Wall Prototype" and the second for "Other Border Wall Prototype."  Both "prototype" RFPs require the wall to be 30 feet tall (although "heights of at least 18 feet may be acceptable"), sunk at least six feet into the ground, and be built in a manner that it would take at least an hour to breach with a "sledgehammer, car jack, pickaxe, chisel, battery operated impact tools,

battery operated cutting tools, Oxy/acetylene torch or other similar hand-held tools." Phase I of the RFPs required bidders to submit Concept Papers by April 4, 2017. Phase II selectees will be required to build a 30' prototype wall within 30 days of the notice to proceed.

155. DHS has thus far deployed fencing along approximately 653 miles of border—one third of the 1,933-mile frontier. Much of this construction was facilitated by the five REAL ID Act waivers totaling approximately 550 miles.

156. Completion of a wall running the length of the border as called for in the Border Security E.O. and Kelly implementing memorandum would require new construction along approximately 1,283 miles of border.

157. DHS has consistently concluded that between 650 and 700 miles of border fencing is necessary to meet its legal mandates, significantly less than the continuous border wall envisioned by the Border Security E.O. and Kelly implementing memorandum. Moreover, the Border Security E.O.'s emphasis on an "impassable" barrier conflicts with DHS's decision to instead utilize vehicle barriers on an existing 300 miles of fencing. Thus, in order to implement the Border Security E.O., DHS would have to propose and implement border wall construction on more than 1,200 miles of border which it has previously and consistently determined were not necessary and appropriate for any border barriers, let alone the impassable border wall as defined under the Border Security E.O.

158. The Border Security E.O., Kelly implementing memorandum, and RFPs thus represent additional "substantial changes" to the DHS southern border enforcement program, and result in environmental impacts far beyond those considered in the 1994 PEIS and 2001 SPEIS. These substantial changes mandate further supplementation of the PEIS under NEPA.

G. Endangered Species Act Violations

159. DHS has failed to engage in consultation to ensure that the southern border enforcement program does not jeopardize listed species or result in the destruction or

adverse modification of their critical habitat, as required by Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2).

160.  On April 4, 2017, the Center provided notice to DHS Secretary John Kelly, CBP Acting Commissioner McAleenan, FWS Acting Director, and U.S. Department of the Interior Secretary Ryan Zinke, pursuant to Section 11(g) of the ESA, 16 U.S.C. § 1540(g), that DHS and CBP are in violation of Section 7 of the ESA, due to its ongoing failure to initiate and complete Section 7 consultation on the effects of its southern border enforcement program.

161.  There are numerous species listed as endangered or threatened pursuant to the ESA that are present in the U.S.-Mexico borderlands region (generally defined as lands within 50 miles of the border), and/or have designated critical habitat, and may be impacted by the DHS southern border enforcement program.  As detailed in this Complaint, for example, 27 species have newly designated or revised critical habitat since the 2001 SPEIS alone.

162.  The Center's notice letter alleges that DHS and CBP  are in violation of the ESA for failing to consult with FWS regarding the southern border enforcement program's impacts on listed species, failing to use the best scientific and commercial data available, and failing to insure that the project will not jeopardize the continued existence of listed species or result in the destruction or adverse modification of their designated critical habitat.

163.  DHS and CBP have sixty days to remedy these alleged violations before Plaintiffs can bring suit pursuant to these claims in Federal District Court.  In the event that DHS fails to remedy the alleged violations within those sixty days, Plaintiffs intend to amend their Complaint in this action to add the alleged ESA violations.

## VII.  CLAIM FOR RELIEF

164.  Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

165.  NEPA requires federal agencies to take a "hard look" at the direct,

indirect, and cumulative impacts of proposed major Federal actions, and at alternatives that could reduce or eliminate those environmental impacts. 42 U.S.C. § 4332 (2)(C)(i)-(ii); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.

166. NEPA's requirements extend to programs such as the DHS southern border enforcement program. 40 C.F.R. §§ 1502.4, 1508.18(b)(2)-(3).

167. NEPA imposes a mandatory, non-discretionary duty on agencies to supplement an already completed analysis for an agency program when the "agency makes substantial changes in the proposed action" *or* "significant new circumstances or information" arises that is relevant to the environmental impacts of the action." 40 C.F.R. § 1502.9(c)(1)(i)-(ii) (emphasis added).

168. DHS has failed to conduct, or consider the need to conduct, additional supplementation of the 1994 PEIS and 2001 SPEIS analyzing the programmatic environmental impacts of the DHS southern border enforcement program despite the presence of both triggering factors.

169. First, DHS has failed to conduct, or consider the need to conduct, additional supplementation of the 1994 PEIS and 2001 PEIS despite the fact that the agency has made substantial changes in the ongoing implementation of the southern border enforcement program since the 2001 SPEIS.

170. Since approval of the 2001 SPEIS, border security appropriations, personnel, fencing and infrastructure, and surveillance technology have dramatically increased, and represent substantial changes to the southern border enforcement program analyzed under the 1994 PEIS and 2001 SPEIS, that are resulting in direct, indirect, and cumulative environmental impacts along the U.S.-Mexico border that were unaddressed or inadequately addressed in those prior programmatic NEPA documents. Consequently, DHS is required to prepare a further supplemental PEIS.

171. In addition, significant new circumstances or information are present in this case, which in turn have resulted in or revealed environmental impacts that were not considered or were inadequately considered in the 1994 PEIS and 2001 SPEIS.

Accordingly, further supplementation of the PEIS is required under NEPA.

172.    These new circumstances or information include, but are not limited to: a) greatly improved scientific understanding of the conservation needs of borderland wildlife species, and the impacts of the border enforcement program on those needs; b) new information regarding threatened and endangered species in the borderlands, including new and improved information regarding the presence and extent of those species and the designation of final or revised critical habitat within 50 miles of the U.S.-Mexico border under the Endangered Species Act for 27 of these species; and c) former DHS Secretary Michael Chertoff's use of REAL ID section 102 authority on five occasions to waive more than 35 laws, including NEPA, that otherwise would have applied to approximately 550 miles of border wall and fencing construction.

173.    DHS has and will continue in the future to implement the southern border enforcement program without having conducted additional supplemental analysis required by NEPA.  As illustrated by the Border Fence E.O., Kelly implementing memorandum, and border wall RFPs, DHS is taking immediate steps to further intensify and substantially change the implementation of border enforcement program.  As such, sufficient federal action remains to occur under the DHS southern border enforcement program that evaluation of the substantial changes to the program, and the new circumstances or information relevant to the environmental impacts of that program, would further the decisionmaking purposes of NEPA.

174.    Despite the passage of 16 years, the substantial changes in the border enforcement program, and the changed circumstances and other new information, DHS has failed to prepare a new supplement to its programmatic NEPA analysis, or to prepare a new programmatic NEPA analysis, in violation of NEPA, 42 U.S.C. § 4332(2)(C) and 40 C.F.R. §1502.9(c), and contrary to the standards of the APA, 5 U.S.C. § 706(1) and (2)(A).

175.    DHS's failure to supplement the 1994 PEIS and 2001 SPEIS with analysis of the substantial changes to the southern border enforcement program, and the new

information and circumstances relevant to the environmental impacts of the program, constitutes agency action that is final and reviewable under the APA, 5 U.S.C. §§ 701(b)(2), 702, 704, and 706. This failure violates NEPA, 42 U.S.C. § 4332(2)(C), and CEQ implementing regulations. 40 C.F.R. §§ 1502.9(c)(1)(i)-(ii), 1502.16, 1508.7, 1508.8.

176. In failing to issue a supplemental PEIS in response to the substantial changes to the southern border enforcement program and the significant new information and changed circumstances detailed in this Complaint, DHS has unlawfully withheld and unreasonably delayed the issuance of a supplemental PEIS to the 1994 PEIS and 2001 SPEIS, contrary to the APA, 5 U.S.C. §706(1) and (2)(A).

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants and provide the following relief:

a)      Declare that DHS violated NEPA by failing to issue a supplemental PEIS in light of the substantial changes made to the proposed action;

b)      Declare that DHS violated NEPA by failing to issue a supplemental PEIS in light of the significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts that has developed since the last supplementation of the PEIS in 2001;

c)      Issue a mandatory injunction requiring DHS to comply with the requirements of NEPA and its implementing regulations;

d)      Retain jurisdiction of this action to ensure compliance with the Court's Orders;

e)      Allow Plaintiffs to recover the costs of this action, including reasonable reimbursement of attorneys' fees; and

f)      Provide such other declaratory and injunctive relief as the Court deems just and proper.

Respectfully Submitted this 12th day of April, 2017.

_(signature)_

Brian Segee (Cal. Bar No. 200795)
Center for Biological Diversity
111 W. Topa Topa Street
Ojai, CA 93023
(805) 750-8852
bsegee@biologicaldiversity.org
_Pro Hac Vice applicant_

Brendan Cummings (Cal. Bar. No. 193952)
Anchun Jean Su (Cal. Bar No. 285167)
Center for Biological Diversity
1212 Broadway #800
Oakland, CA 94612
(510) 844-7100
bcummings@biologicaldiversity.org
jsu@biologicaldiversity.org
_Pro Hac Vice applicants_

Attorneys for Plaintiffs