**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Center for Biological Diversity, et al., | No. CV-17-00163-TUC-CKJ |
| Plaintiffs, | **ORDER** |
| v. | |
| Alejandro Mayorkas,[1] et al., | |
| Defendants. | |

Before the Court are Plaintiffs' Motion for Summary Judgment (Doc. 63) and Defendants' Cross-Motion for Summary Judgment (Doc. 69).  For the reasons that follow, Plaintiffs' motion for summary judgment is GRANTED IN PART AND DENIED IN PART, and Defendants' cross-motion for summary judgment is GRANTED IN PART AND DENIED IN PART.  The Court finds that Defendants violated NEPA but did not violate the ESA.  Plaintiffs' request for injunctive relief is DENIED.

**BACKGROUND**

In 1989, President George H.W. Bush created six regional joint task forces, named Joint Task Force-Six (the "Task Force"), to coordinate anti-drug efforts between the military and local law enforcement agencies and to provide military reinforcements to those agencies for anti-drug efforts.  Sean J. Kealy, *Reexamining the Posse Comitatus Act: Toward A Right to Civil Law Enforcement*, 21 Yale L. & Pol'y Rev. 383, 419 (2003).  The

---

[1] At the time of the original complaint, John F. Kelly was the Secretary of DHS. (Doc. 1 at 10) Since February 1, 2021, Alejandro Mayorkas has been the Secretary. U.S. Department of Homeland Security, http://www.dhs.gov/secretary (last visited Aug. 19, 2021).

Task Force provides operational, engineering, and general support to law enforcement agencies that conduct operations at United States borders when the agencies request such support.  (Doc. 70 at 16)  The support comes in the form of the design and construction of buildings, training facilities, roads, fences, and lighting; the manning of ground patrols and listening and observation posts; and the processing and analysis of data.  *Id*.  The Task Force has always been classified as a military command unit under the United States Department of Defense.  *Id*.

In 1994, the Department of Defense and the United States Immigration and Naturalization Service ("INS") prepared a final programmatic environmental impact statement to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*    A.R. at 1, 15.[2] The impact statement addressed the cumulative environmental effects of past and reasonably foreseeable Task Force activity for numerous law enforcement agencies along a 50-mile-wide border corridor in Texas, New Mexico, Arizona, and California.  *Id*. at 15. At the time, INS—through its Border Patrol component—had been the primary beneficiary of Task Force activity and elected to be the lead agency for the preparation of the statement.  *Id*. at 3. The statement described general Task Force projects and discussed the types of expected environmental impacts from the continuation of border-enforcement activity.  *Id*. at 15.

In 2001, the Departments of Justice and Defense prepared a final supplemental programmatic environmental impact statement.  *Id*. at 268. While maintaining a programmatic approach, the supplemental statement had a narrower focus than its predecessor and only addressed activity that supported INS projects from 1994 to 2001.  *Id*. at 297; 389.  The statement's focus was narrowed because the agencies felt that the document's scope was overly broad, which caused confusion among the public.  *Id*. at 389. In addition to discussing past Task Force activity, the statement also presented the anticipated level of activity for a five-year period, dating from 2000 to 2005.  *Id*. at 297.

In 2017, the Center for Biological Diversity (the "Center"), a non-profit

---

[2] The Administrative Record in this case is abbreviated as "A.R.".

1    environmental organization, and United States Congressman Raul Grijalva, filed suit in
2    this Court alleging, inter alia, that the Department of Homeland Security (the
3    "Department")[3] and its agency component, Customs and Border Protection, violated NEPA
4    by failing to update their programmatic environmental analysis for border-enforcement
5    activity[4] since 2001.  (Doc. 14 at 2)  Plaintiffs also alleged that Defendants failed to consult
6    with the United States Fish and Wildlife Service ("FWS") concerning the impacts of
7    border-enforcement activity on threatened or endangered species in violation of Section
8    7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*  *Id.*

9          In March 2019, the Department officially withdrew from programmatic and
10   supplemental programmatic environmental impact statements.  A.R. at 8832.  Prior to the
11   parties' filing of summary judgment motions, Defendants expanded the Administrative
12   Record to include 95 individual documents covering approximately 9,000 pages in length.
13   Doc. 49 at 29.  Defendants also supplemented the Administrative Record on multiple
14   occasions throughout the litigation and submitted four declarations from their
15   Environmental Planning and Historic Preservation Program Manager, which explained the
16   reasoning behind Defendants' withdrawal from programmatic environmental impact
17   statements and the logic surrounding other environmental decisions affecting the area in
18   question.  *See* Docs. 49 at 3-29; 54-3 at 2-6; 56 at 5-9; 62-1 at 2-8.  At the summary
19   judgment stage, Plaintiffs' NEPA and ESA claims remain.

20                        **PROCEDURAL HISTORY**

21          On July 24, 2020, Plaintiffs filed their Motion for Summary Judgment (Doc. 63),
22   Statement of Undisputed Material Facts (Doc. 65) and amended Memorandum in Support
23   of Motion for Summary Judgment (Doc. 66).  On September 18, 2020, Defendants filed
24   their Cross-Motion for Summary Judgment (Doc. 69), Combined Opposition to Plaintiffs'
25   Motion for Summary Judgment and Memorandum in Support of Cross-Motion for
26

27   [3] In 2003, Congress created Customs and Border Protection by combining elements of the former INS and United States Customs Service. Congress made Customs and Border Protection a component agency of DHS. (Doc. 71, ¶ 2 at 4)
28   [4] The Court substitutes Plaintiffs' use of the term "southern border enforcement program" with the activity it attempts to label.

Summary Judgment (Doc. 70), Statement of Undisputed Material Facts (Doc. 71), and Response to Plaintiffs' Statement of Facts (Doc. 72).  On October 30, 2020, Plaintiffs filed their Combined Opposition to Defendants' Motion for Summary Judgment and Reply Brief in Support of Motion for Summary Judgment (Doc. 73), and Response to Federal Defendants' Statement of Undisputed Material Facts (Doc. 74).  On November 20, 2020, Defendants filed their Reply in Support of Cross-Motion for Summary Judgment (Doc. 75).  On February 23, 2021, the Court heard oral argument on the parties' summary judgment motions.  (Doc. 77)  This Order follows.

## LEGAL STANDARD

"The Administrative Procedure Act ("APA") governs judicial review of agency action." *The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003).  "In a case involving review of final agency action under the APA, . . . the Court's role is limited to reviewing the administrative record," *Colorado River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 200 (D.D.C. 2012), and it "generally need not perform any fact-finding," *All. for the Wild Rockies v. U.S. Forest Serv.*, No. 2:19-CV-00350-SMJ, 2020 WL 7049556, at *5 (E.D. Wash. Dec. 1, 2020).  At the summary judgment stage, the court need only determine whether "as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (cleaned up).

"Agency action is valid if a reasonable basis exists for the agency's decision." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (cleaned up).  "A reasonable basis exists where the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (citation and quotation marks omitted).  "*Post hoc* explanations of agency action . . . cannot substitute for the agency's own articulation of the basis for its decision." *Id.* at 1113.  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Colorado River*, 898 F. Supp. 2d at 200 (cleaned up).  "When parties file cross-motions for summary judgment, the [c]ourt must consider the evidence submitted in

- 4 -

support of both motions before ruling on either motion." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. CV 17-8587-GW(ASX), 2019 WL 2635587, at *8 (C.D. Cal. June 20, 2019).

## DISCUSSION

### I.      Standing

As a preliminary matter, Defendants argue that Plaintiffs lack standing to sue in federal court. (Doc. 70 at 20-25). Plaintiffs lack standing, Defendants argue, because their past injuries are not redressable through after-the-fact environmental review and their speculative fears about future injury arising from unspecified projects do not satisfy their burden to identify specific, final agency action approving a border enforcement project as the source of those fears. *Id.* at 10. Plaintiffs argue that their declarations establish standing by showing that they suffer injuries that are concrete, particularized, actual and imminent, fairly traceable to the challenged action, and redressable. (Doc. 73 at 8-10) The issue for the Court to determine is whether Plaintiffs' declarations satisfy the standing requirements for environmental claims that involve procedural injuries.[5]

In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, the Supreme Court outlined the standard for organizational standing. 528 U.S. 167 (2000). It concluded:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

---

[5] *See WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (concluding that a claim "alleging a NEPA violation" is procedural); *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (en banc) ("[A]lleged violations of Section 7(a)(2)'s consultation requirement constitute a procedural injury for standing purposes.").

*Id*. at 181 (quotation marks omitted). "When there are multiple plaintiffs, at least one plaintiff must have standing to seek each form of relief requested in the complaint." *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 917 (9th Cir. 2018) (cleaned up). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, (1992).

### A.    Injury in Fact

"The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). "[A]n individual can establish 'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded." *Id*. at 1149; *see also Friends of the Earth,* 528 U.S. at 183 ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.")

### B.    Causation and Redressability

"A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the Article III standing inquiry, causation and redress[a]bility." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008). To satisfy the causation and redressability prongs, "[s]uch a litigant need only demonstrate that he has a procedural right that, if exercised, *could* protect his concrete interests and that those interests fall within the zone of interests protected by the statute at issue." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (cleaned up).

### 1.    Plaintiffs' Declarations Establish Standing

The Center submits four declarations from of its members[6] to establish standing. *See* Docs. 66-2; 66-5; 66-6; 66-7.  In one declaration, Center member Randy Serraglio averred that: he has lived in Tucson, Arizona, since 1990; he has hiked, birded, and done photography several times in the Coronado National Memorial within the past two years; while visiting the Memorial he hopes for the opportunity to observe rare and vulnerable species including the Chiricahua leopard frog, jaguar, Gila chub, and Mexican spotted owl; knowing that he may come across them enhances his enjoyment of time in this area; he plans to revisit a number of sites in the Coronado National Forest during migration and breeding season in the coming years; his use and enjoyment of the borderlands has been degraded in recent years by the effects of the increased amount of border enforcement activities at the border; where he expects to see vast, pristine vistas of deserts, grasslands, forests, and mountains, they are instead broken up by 18-and-30-foot high border walls, extremely tall surveillance towers, equipment yards, badly constructed and eroding roads, and other ugly scars on the landscape; and, the Border Patrol has recently announced the start of new construction in the Memorial itself, which will wall off and eliminate one of the few remaining jaguar corridors that cross the border and destroy the scenic solitude of the southern terminus of the Arizona National Scenic Trail.  (Doc. 66-6 at 2, 4-7)

Congressman Grijalva's declaration was also submitted to the Court.  *See* Doc. 66-3.  The Congressman averred that: he currently resides in Tucson, Arizona; he is injured when federal agencies fail to comply with federal environmental laws that are necessary to protect his property, health, and the environment; border security activities, which include physical barriers, increased border agents, road construction not associated with border wall construction, helicopter flights, lighting, and other actions have resulted in significant changes in the border region; he has been harmed by agencies' failures to comply with NEPA and other federal laws; border activities stand to cause imminent harm to his interest

---

[6] The Center submits six declarations in total; however, only four declarations indicate that the declarants are Center members.

in seeing intact desert ecosystems, listening for birds, and observing wildlife along the southern border; in January 2020, he visited Organ Pipe Cactus National Monument and witnessed a current construction area; in February 2020, the Department conducted blasting on the site resulting in the potential destruction of bone fragments dating back to the 1600's; he also visited Quitobaquito Springs where certain areas were cut down exposing and destroying ancient artifacts; he noticed groundwater extraction at various areas within the Organ Pipe National Park; and he plans on re-visiting Organ Pipe Cactus National Monument along with other border areas, as soon as this Fall. *Id*. at 2-10.

These declarations demonstrate that Plaintiffs use specific affected areas of southern borderlands where Defendants have been permitted to conduct operations, these are areas to which Plaintiffs intend to return, and Plaintiffs' aesthetic and recreational interests in the affected areas will be diminished by unchecked border-enforcement activity or agency failure to conduct supplemental programmatic environmental analysis. In addition to demonstrating Plaintiffs' injuries in fact, the declarations also establish that compliance with NEPA and the ESA *could* protect Plaintiffs' aesthetic and recreational interests in specific borderland areas.

Defendants' proposed standing requirement is too restrictive for the claims at hand. *See* Doc. 70 at 20-25. It is true that a "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." (Doc. 70 at 21) However, Defendants ignore the fact that Plaintiffs have identified, in great detail, aesthetic and recreational interests that *could* be affected by their failure to comply with NEPA and the ESA. Similar arguments attacking an organization's ability to bring environmental claims have been addressed and dismissed by the United States Court of Appeals for the Ninth Circuit. *See Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1079-80 (9th Cir. 2015) (rejecting agency's argument that the plaintiff lacked standing because it failed to challenge discrete agency action that would cause direct injury); *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1155 (9th Cir. 2015) (finding that plaintiff environmental

organization could challenge a failure to update a programmatic environmental impact statement through its member's assertion of recreational and aesthetic injury to a specific impacted geographic area); *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1515–18 (9th Cir.1992) (holding that plaintiffs had standing to challenge a non-site-specific environmental impact statement that caused an injury in fact).  Because Mr. Serraglio and Congressman Grijalva would have standing to bring the NEPA and ESA claims on their own, and the Center also satisfies the other associational standing requirements, the Center and Congressman Grijalva have standing to proceed to the merits of their claims.

## II.    NEPA Violation

Plaintiffs argue that Defendants violated NEPA by failing to issue a supplemental environmental impact statement despite the presence of factors requiring supplementation. (Doc. 66 at 25-39).  Plaintiffs also contend that Defendants violated NEPA by failing to take a "hard look" at the environmental consequences before withdrawing from the 1994 and 2001 programmatic environmental impact statements in their entirety.  *Id*. at 40-46. Defendants argue that their decision to withdraw from programmatic environmental impact statements is unreviewable and that there is no ongoing major federal action which requires programmatic environmental supplementation.  (Doc. 70 at 25-37)

After thorough review of the Administrative Record, the Court finds that there is ongoing major federal action in the form of southern-border enforcement activity, and that, at the time, Defendants violated NEPA by failing to take a "hard look" before deciding to conduct environmental analysis at the project-level and prior to withdrawing from programmatic environmental impact statements altogether. The Administrative Record is devoid of information demonstrating Defendants adequately identified and evaluated any adverse environmental impacts of their proposed action before implementing their new strategy.  The Court addresses Defendants' arguments in the order of impact on its decision.

### A.    Statutory Requirements

NEPA has twin aims: It places an obligation on agencies to "consider every significant aspect of the environmental impact of a proposed action," and "it ensures that

the agency will inform the public that it has indeed considered environmental concerns in its decision[-]making process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).  As part of the decision-making process, NEPA requires federal agencies to prepare an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C). The environmental impact statement must discuss "the environmental impact of the proposed action" and include alternatives to the action.  *Id.*

"The subject of postdecision supplemental environmental impact statements is not expressly addressed in NEPA." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 370 (1989).  "Preparation of such statements, however, is at times necessary to satisfy the Act's 'action-forcing' purpose."  *Id.*  The Council on Environmental Quality ("CEQ"), which issues guidance to assist federal agencies in understanding and complying with NEPA, requires agencies to supplement environmental impact statements in certain circumstances. *Id.* at 372-73. Federal agencies must prepare supplements to either draft or final environmental impact statements if: "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c) (1978); *Marsh*, 490 U.S. at 372. "[S]upplementation is necessary only if there remains major Federal action to occur[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 73 (2004).  "[I]n the context of reviewing a decision not to supplement an [environmental impact statement], courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information."  *Marsh*, 490 U.S. at 378.

## 1.   Ongoing Major Federal Action

Defendants argue that no major federal action remains which requires supplementation, that there has never been a "southern border enforcement program," and

1    that Plaintiffs fail to identify any program that continues to rely on their original
2    environmental impact statement. (Doc. 70 at 28-37) Plaintiffs argue that Defendants
3    continue to perform the same border-enforcement activity that was analyzed in their initial
4    environmental impact statement and that the reorganization of border enforcement
5    agencies does not remove the agencies' responsibility to supplement their programmatic
6    analysis. (Doc. 73 at 11-14) Plaintiffs also argue that the Administrative Record
7    demonstrates Defendants' long reliance on the initial and supplemental environmental
8    impact statements and that the cumulative environmental impacts of agency action can only
9    be adequately addressed through a programmatic analysis.  *Id*. at 12-14

10        This Court has previously concluded that the requirement of an environmental
11   impact statement is fact based rather than guided by superficial program labels.  *See* Doc.
12   40 at 3. Until recently, the CEQ defined "major federal action" to include "new and
13   continuing activities, including projects and programs entirely or partly financed, assisted,
14   conducted, regulated, or approved by federal agencies; [and] new or revised agency rules,
15   regulations, plans, policies, or procedures; and legislative proposals." 40 C.F.R.
16   § 1508.18(a) (1978).  The Supreme Court has ruled that CEQ's interpretation of NEPA is
17   entitled to substantial deference and that its regulations are binding on federal agencies.
18   *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 355-56 (1989).

19        Here, the Administrative Record demonstrates that since 1989, there has been major
20   federal action in the form of border-enforcement activity along a 50-mile-wide border
21   corridor in four states, including Arizona. A.R. at 15, 268-73. Defendants initially prepared
22   individual, site-specific environmental assessments to comply with NEPA.  *Id*. at 20.  But
23   in 1992, the agencies changed course and elected instead to prepare programmatic
24   environmental analysis, as the number of their projects increased, public resource agencies
25   realized the geographic scope of their work, and concerns about cumulative environmental
26   impacts arose.  *Id*.

27        The 1994 environmental impact statement discussed the clearing of approximately
28   2,500 acres of wildlife habitat for joint agency activity and predicted more than 3,000

1    additional acres of wildlife habitat would be impacted by their actions over the following

2    five years. A.R. at 4; 114. The 2001 supplemental environmental impact statement

3    estimated that anticipated infrastructure development would affect an additional 6,900

4    acres of wildlife habitat. *Id.* at 309; 361.  The anticipated level of environmental impact

5    from border-enforcement activity in 2001 to 2005 was nearly double the environmental

6    impact of border-enforcement activity from 1989 to 2000. *Id.* at 310.

7         Additionally, the Administrative Record is replete with examples of expanding

8    federal action in the form of border-enforcement activity.  For example, the June 2001

9    supplemental environmental impact statement and its Record of Decision indicate:

10
         The National Drug Control Strategy (in addition to the INS National,
11       regional and field strategies), . . . has focused attention on the southwestern
         United States. The number of [United States Border Patrol] agents is
12       expected to significantly increase during the next 10 years. In order to
         accommodate these new agents, support staff, resources, and continued
13       assistance from JTF-6 would be sought. Infrastructure would need to be
         constructed or improved to ensure that these agents can effectively and
14       efficiently perform their duties. Support would also be needed in training,
         intelligence gathering, detecting and deterring illegal activities, and
15       administrative functions such as transporting evidentiary materials seized by
         USBP during drug busts. INS must provide this support to its law
16       enforcement arm (USBP) in order for the USBP to effectively implement the
         strategy for gaining and maintaining control of the border. An integral part
17       of providing these means to effectively operate is the assistance INS receives
         from the DoD, particularly in regards to JTF-6 support missions.
18       . . . .

19
         The National Drug Control Strategy . . . projects up to 1,000 new USBP
20       agents should be hired over the next 10 years. Filling these new positions
         would increase employment, income and sales within local and regional
21       economies both directly and indirectly. The magnitude of these effects would
         depend upon the size and economic condition of the community affected, the
22       number of positions filled, and the number of local persons hired to fill the
         positions. As discussed in Chapter 1 of this [Supplemental Programmatic
23       Environmental Impact Statement], these new agents will require new and/or
         upgraded infrastructure (e.g., roads, fences, ISIS, etc.) in order to effectively
24       perform their duties.
         . . . .

- 12 -

The proposed action and preferred alternative under this FSPEIS is to implement full JTF-6 support to INS' mission to gain and maintain control of the southwestern U.S./Mexico border. The INS will enhance its operation, programs and staff through increases in agents' presence, facilities, and infrastructure during the next 5 years, as specified in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, as amended. In order to accommodate these new initiatives it will be necessary to provide infrastructure support to ensure that agents will be able to effectively and efficiently perform their duties.

*Id.* at 288, 370, 487.

This activity unquestionably constitutes "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." *See* 40 C.F.R. § 1508.18(a) (1978). Accordingly, the Court finds that there is ongoing major federal action in the form of border-enforcement activity along the 50-mile-wide southern border corridor where Defendants operate.

## 2.    Defendants Failed to Conduct "Hard Look"

Notwithstanding the fact that there is ongoing major federal action in the form of border-enforcement activity, Defendants argue that they maintained NEPA compliance by conducting environmental assessments at the site- and project-specific level. (Doc. 70 at 28-32) Plaintiffs argue that Defendants violated NEPA by failing to take a "hard look" at whether significant changes to border-enforcement activity, its circumstances, and information relevant to the activity's environmental impacts, demands supplementation of the 2001 programmatic environmental analysis. (Doc. 73 at 11, 15-19) Plaintiffs contend that absent sufficient explanation in the Administrative Record demonstrating that Defendants took a "hard look" at significant border-enforcement changes and new information, Defendants have acted in an arbitrary and capricious manner. *Id.*

NEPA requires federal agencies to take a "hard look" at the potential environmental consequences of a proposed action, "even after a proposal has received initial approval." *Marsh*, 490 U.S. at 374; *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011). "If an agency decides not to prepare an environmental impact

- 13 -

statement, it must supply a convincing statement of reasons to explain why a project's impact[s] are insignificant." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quotation marks and citation omitted). "The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Id*. The decision not to prepare a supplemental environmental impact statement is controlled by the "arbitrary and capricious" standard. *Marsh*, 490 U.S. at 376.

In determining whether an agency's decision to forego supplemental environmental analysis was arbitrary or capricious, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh*, 490 U.S. at 360. "A court will uphold a decision not to supplement an environmental analysis if the decision is reasonable." *Oregon Nat. Res. Council Action v. U.S. Forest Serv.*, 445 F. Supp. 2d 1211, 1225–26 (D. Or. 2006). "Reasonableness depends on the environmental significance of the new information, the probable [accuracy] of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data." *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1464 (9th Cir. 1984). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350.

Plaintiffs assert that Defendants violated NEPA because they failed to timely prepare, or sufficiently evaluate the need for, a supplemental environmental impact statement in light of substantial expansion of border-enforcement activity and the designation of new or revised critical habits for threatened or endangered species that live within the border-enforcement area. (Doc. 73 at 15) Plaintiffs support these assertions with approximately fifty undisputed statements of fact demonstrating, for example, that between "2006 to 2011, the Border Patrol nearly doubled the number of agents on patrol, constructed hundreds of miles of border fences, and installed a variety of surveillance

equipment," and that "[s]ince September 11, 2001, and the creation of DHS, annual appropriations [to southern-border-enforcement activity] increased . . . by an additional 170 percent, to $3.8 billion in FY2015."  (Doc. 65 at ¶¶ 92, 94).  Plaintiffs also highlight undisputed statements of fact which demonstrate that there was a large number of new or revised critical habitat designations for threatened or endangered species within the southern border enforcement corridor since 2001.  *Id.* at ¶¶ 120-148.

Plaintiffs' undisputed facts, especially in light of their cumulative effect, constitute triggering events for which Defendants should have contemporaneously  considered and evaluated the need for supplemental environmental analysis.  *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558 (9th Cir. 2000) (finding federal agency violated NEPA by failing to prepare, or sufficiently consider and evaluate the need for, a supplemental environmental impact statement in light of seven new sensitive species designations and recognition that standards on which the original impact statement relied were inadequate); *In re Operation of Missouri River Sys. Litig.*, 516 F.3d 688, 693 (8th Cir. 2008) (cleaned up) (reiterating that "[a] substantial change that requires an SEIS under 40 C.F.R. § 1502.9(c)(1)(l) is one that is *not* qualitatively within the spectrum of alternatives that were discussed in a prior FEIS."). While Defendants' undisputed statements of fact demonstrate that they performed individual, site-specific environmental assessments for some of the triggering events that Plaintiffs raise, *see* Doc. 71 at ¶¶ 47-48, 56, it is of no consequence that they elected to conduct project-level assessments instead of issuing a supplemental statement if they failed to contemporaneously articulate a reasonable explanation for their decision.  *See Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 690 (9th Cir. 2007) (finding federal agency acted in arbitrary and capricious manner when the agency failed to cogently explain its decision, the record failed to indicate that the decision was the result of a rational decision-making process, and the agency failed to consider the purposes of the environmental statute which required it to make a reasoned decision.).

The Administrative Record provides only limited clues and post-hoc analysis[7] to justify Defendants' decision to forego supplemental programmatic environmental analysis and instead conduct individual, site-specific environmental assessments on a project level for border-enforcement activity. For example, the June 2001 final supplemental environmental impact statement and the Department's March 2019 withdrawal determination state:

> In addition, the NEPA team felt that the scope of the original Draft SPEIS was so broad (covering independent activities of two Federal agencies), that the document caused confusion among the general public. Consequently, the NEPA team decided to refocus the scope of the SPEIS to address just the support provided by JTF-6 to INS and the ISIS program within the 50-mile corridor and to resubmit the revised Draft SPEIS to the public for review.

A.R. at 389.

> U.S. Customs and Border Protection (CBP), a component of the Department of Homeland Security (DHS) and Joint Task Force-North (JTF-N), a Joint Command of the Department of Defense (DoD), have evaluated their compliance with the National Environmental Policy Act (NEPA) for activities now being undertaken by and in support of federal law enforcement agencies in the four states bordering Mexico. Actions currently taken by either CBP or JTF-N comply with NEPA through individual project analyses. CBP and JTF-N NEPA compliance does not rely on the Records of Decision and the supporting joint Programmatic Environmental Impact Statement (PEIS) of 1994 or the Supplemental Programmatic EIS (SPEIS) of 2001, documents created by predecessor entities that no longer exist. Supplementing the documents is of no current value and would be an unwise use of resources.

A.R. at 8832.

---

[7] *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007) (cleaned up) ("Post-hoc examination of data to support a pre-determined conclusion is not permissible because this would frustrate the fundamental purpose of NEPA, which is to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions, early enough so that it can serve as an important contribution to the decision making process."); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir.1996) ("[P]ost-decision information . . . may not be advanced as a new rationalization either for sustaining or attacking an agency's decision.").

1    The Court finds this limited justification—among thousands of pages of
2    environmental data and administrative records—fails to demonstrate that Defendants took
3    a "hard look" and made a reasoned decision to forego, and ultimately withdraw from,
4    supplemental programmatic environmental impact statements despite the presence of
5    significant triggering events since the statement was last supplemented in 2001. The
6    Administrative Record fails to demonstrate that Defendants identified and evaluated the
7    environmental consequences of their decision(s) to switch from conducting site-specific
8    assessments to issuing programmatic impact statements to going back to conducting site-
9    specific assessments in relation to border-enforcement activity. Accordingly, the Court
10   finds the decisions in question were arbitrary and capricious and grants Plaintiffs' summary
11   judgment motion on the issue.

12   **III.    ESA Violation**

13   In a related claim, Plaintiffs argue that despite the presence of newly listed species
14   and revised critical habitat designations since 2001, Defendants have failed to initiate and
15   complete consultation with the FWS to ensure continuing border-enforcement activity does
16   not jeopardize the existence of the species or adversely affect their designated critical
17   habitats.  (Doc. 66 at 47)  Perplexingly, Plaintiffs assert that Defendants have a duty to
18   conduct Section 7 ESA consultation on the NEPA supplementation that they seek to
19   compel in this case.  (Doc. 73, n.4 at 15)  Defendants argue that Plaintiffs lack standing to
20   bring their claim; Defendants cannot be in violation of the ESA in connection with a future
21   NEPA analysis; Plaintiffs have failed to provide a valid 60-day notice of intent to sue, and;
22   a court-ordered NEPA analysis would not require ESA consultation.  (Doc. 75 at 15-22)

23   Assuming *arguendo* that Plaintiffs have standing to sue for a prospective Section 7
24   violation and that their April 2017 notice sufficiently informed Defendants of the claim at
25   hand, the Court finds that Plaintiffs fail to sufficiently demonstrate that the ESA mandates
26   programmatic FWS consultation and that a hypothetical NEPA supplementation would
27   trigger such a requirement.

28

### A.        Statutory Requirements

In *National Ass'n of Home Builders v. Defenders of Wildlife*, the Supreme Court summarized the background and scope of the ESA.  551 U.S. 644 (2007).  It observed:

> The Endangered Species Act of 1973 . . . is intended to protect and conserve endangered and threatened species and their habitats. Section 4 of the ESA directs the Secretaries of Commerce and the Interior to list threatened and endangered species and to designate their critical habitats. The Fish and Wildlife Service (FWS) administers the ESA with respect to species under the jurisdiction of the Secretary of the Interior, while the National Marine Fisheries Service (NMFS) administers the ESA with respect to species under the jurisdiction of the Secretary of Commerce.
>
> Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora. Section 7(a)(2) provides that [e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of Commerce or the Interior], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species.

*Id*. at 651–52 (citations and quotation marks omitted). ESA implementing regulations broadly define "agency action" to constitute "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States" including, but not limited to, "actions directly or indirectly causing modifications to the land, water, or air."  50 C.F.R. § 402.02(d); *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1020-21 (9th Cir. 2012).

### 1.        Programmatic Consultation Not Required

Plaintiffs cite a number of cases to support their contention that Section 7 ESA consultation—on a programmatic basis—is required for Defendants' ongoing border-enforcement activity.  *See* Docs. 66 at 46-47; 73 at 21-22.  However, neither the statute itself nor the case law surrounding the ESA mandate such broad consultation, where individual, site-specific consultation sufficiently analyzes the environmental impact of proposed agency action.  The cases Plaintiffs cite are based upon fact scenarios that are

vastly dissimilar to the facts at hand.  *See N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 454 F. Supp. 3d 985, 987-89 (D. Mont. 2020) (addressing agency's decision to reissue nationwide permit without first consulting with the Services); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, No. CV 16-8418 PSG, 2018 WL 5919096, at *1 (C.D. Cal. Nov. 9, 2018) (addressing allegation that agencies violated ESA by failing to consult with the Services about the effects of off-shore fracking on wildlife before issuing a programmatic environmental assessment); *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1077-80 (9th Cir. 2015) (addressing allegation that agency violated ESA by failing to reinitiate consultation with FWS after FWS revised its critical habit designation for Canada lynx); *Greenpeace v. Nat'l Marine Fisheries Serv.*, 55 F. Supp. 2d 1248, 1253-58 (W.D. Wash. 1999) (addressing allegation that agency's no-jeopardy conclusion concerning mackerel fishery in biological opinion was arbitrary and capricious).

Here, the facts demonstrated by the Administrative Record fail to involve the reissuance of nationwide permits, the optional requirement to consult with the Services before issuing initial environmental assessments, a failure to reinitiate consultation after a determination that critical habitat information was improperly formulated, or any claims that challenge an agency's conclusion based on questionable information contained in biological opinions.  Plaintiffs propose that Defendants violated the ESA because they failed to initiate consultation with the FWS in conjunction with a supplemental programmatic environmental analysis that this Court declines to order.  *See infra* pp. 20-22.  Section 7(a)(2) of the ESA "commands each federal agency to insure that any *action* authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any endangered species . . . or result in the destruction or adverse modification of habitat of such species."  *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1252 (9th Cir. 2017) (emphasis added) (quotation marks and citation omitted).  Such non-existent NEPA supplementation fails to constitute agency action even under the broadest interpretation of the term.

1    Moreover, the Administrative Record indicates that in 2001, Defendants did comply

2    with Section 7 ESA requirements by issuing biological assessments on site-specific

3    operations and that they made a commitment to coordinate with the FWS to address

4    potential impacts to threatened or endangered species during the preplanning stages of, or

5    prior to undertaking, site-specific activities.  A.R. at 366-67.  The Administrative Record

6    also indicates that Defendants addressed a significant number of the newly designated or

7    revised critical habitat designations that Plaintiffs now challenge on a project-specific

8    basis.  *See e.g.*, A.R. at 618 (Mexican Spotted Owl); 1150-51 (Jaguar); 2295 (Southwestern

9    Willow Flycatcher); 3064 (Gila Chub); 3284 (Chiricahua Leopard Frog); 6545 (Arroyo

10   Toad).  The Court credits Defendants' uncontested statement of fact that explains why the

11   Administrative Record fails to contain documentation for each instance of newly

12   designated critical habitat that Plaintiffs raise.  *See* Doc. 71, ¶ 55 at 20.  Accordingly, the

13   Court finds that Defendants have not violated Section 7(a)(2) of the ESA by failing to

14   consult with the FWS regarding prospective NEPA supplementation and grants

15   Defendants' cross-motion for summary judgment on the issue.

16   **IV.    Remedy**

17   To remedy a procedural NEPA violation, Plaintiffs request that the Court grant their

18   motion, vacate the determination to withdraw from programmatic environmental analysis

19   and remand the matter back to Defendants with instructions to supplement their

20   programmatic environmental impact statement by a date certain. (Doc. 73 at 25)

21   Defendants request that the Court deny Plaintiffs' motion, grant their cross-motion for

22   summary judgment, and dismiss Plaintiffs' complaint with prejudice.  (Docs. 70 at 46; 75

23   at 23)  The issue for the Court to determine is whether injunctive relief is the appropriate

24   remedy for Defendants' NEPA violation.

25   In *Monsanto Co. v. Geertson Seed Farms*, the Supreme Court outlined the

26   appropriate standard for injunctive relief for a NEPA violation. 561 U.S. 139 (2010).

27   It instructed:

28

1
2
3
4
5
6

> [A] plaintiff seeking a permanent injunction must satisfy a four-factor test
> before a court may grant such relief. A plaintiff must demonstrate: (1) that it
> has suffered an irreparable injury; (2) that remedies available at law, such as
> monetary damages, are inadequate to compensate for that injury; 3) that,
> considering the balance of hardships between the plaintiff and defendant, a
> remedy in equity is warranted; and (4) that the public interest would not be
> disserved by a permanent injunction. The traditional four-factor test applies
> when a plaintiff seeks a permanent injunction to remedy a NEPA violation.

7
8
9
10

*Id.* at 156-57 (quotation marks and citations omitted).  The court also advised that "[a]n injunction should issue only if the traditional four-factor test is satisfied[,]" *id.* at 157, and that injunctive relief "is a drastic and extraordinary remedy, which should not be granted as a matter of course[,]" *id.* at 165.

11
12
13
14
15
16
17
18
19
20
21
22
23

In addition to the Supreme Court's guidance, the Ninth Circuit has determined that "if extra-record evidence shows that an agency has rectified a NEPA violation after the onset of legal proceedings, that evidence is relevant to the question of whether relief should be granted." *Friends of the Clearwater*, 222 F.3d at 560; *see also Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1025-26 (9th Cir. 1980) (finding that while agency's actions did not comport with NEPA, the deficiency had been cured by an extensive post-trial study which reaffirmed the foundation of a prior supplemental impact statement).  The court has also concluded that "[e]ven when a district court finds that a violation of [NEPA] has occurred, in unusual circumstances an injunction may be withheld, or . . . limited in scope," *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1020 (9th Cir. 2009), and "[i]n determining the scope of an injunction, a district court has broad latitude, and it must balance the equities between the parties and give due regard to the public interest," *Geertson Seed Farms v. Johanns*, 570 F.3d 1130, 1136 (9th Cir. 2009).

24
25
26
27
28

Curiously, Plaintiffs have waited over fifteen years to bring claims that address procedural NEPA violations, which primarily occurred in 2001 and in the immediate years thereafter.  With the exception of Defendants' decision to withdraw from programmatic environmental analysis in 2019, Plaintiffs complain of agency non-activity that has failed to result in any  demonstrated adverse environmental consequences due, in part, to the fact

that Defendants complied with NEPA requirements through individual, project-specific environmental assessments.  *See e.g.,* A.R. at 3730-4101, 4127-4531, 5265-5354, 6348-6433, and 14780-14971.  As a result of this litigation, Defendants have also thoroughly evaluated and explained the "hard look" criteria that the Court determined was absent from the Administrative Record when the agencies made their decisions years ago.  *See* Hass Declarations, Docs. 49 at 3-29; 54-3 at 3-6; and 62-1 at 6-8.  Defendants' recent activity has mitigated any prospective harm that Plaintiffs seek to remedy, and the Administrative Record fails to indicate detrimental environmental consequences as a result of Defendants' NEPA violations.

In many ways, the claims at hand were best suited for litigation and injunctive relief more than a decade ago.  To grant Plaintiffs' request for an injunction at this point would be duplicative, counter-intuitive, and a misallocation of agency resources.  The interests of the public would not be served by updating environmental impact statements which have since been withdrawn and that no longer serve as guideposts for future agency activity.  While Defendants' failure to contemporaneously document justification for their internal decisions constitute NEPA violations, such failure, in this case, does not necessitate injunctive relief.  Accordingly, Plaintiffs' request for injunctive relief is denied, and this case is closed.

**IT IS ORDERED:**

1.  Plaintiffs' Motion for Summary Judgment (Doc. 63) is GRANTED IN PART AND DENIED IN PART.  The Court GRANTS Plaintiffs' Motion for Summary Judgment on their NEPA claim, and DENIES Plaintiffs' Motion for Summary Judgment on their ESA claim.

2.  Defendants' Cross-Motion for Summary Judgment (Doc. 69) is GRANTED IN PART AND DENIED IN PART.  The Court GRANTS Defendants' Cross-Motion for Summary Judgment on their ESA claim, and DENIES Defendants' Cross-Motion for Summary Judgment on their NEPA claim.

3.  Plaintiffs' request for injunctive relief is DENIED.

4.  The Clerk of Court is instructed to change the name of Defendant Secretary of Homeland Security to Alejandro Mayorkas on the case caption, issue judgment in accord with the aforementioned instructions, and close this case.

Dated this 20th day of August, 2021.

Honorable Cindy K. Jorgenson
United States District Judge

- 23 -